Filed 11/4/13 (opn. on rehearing)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SAMUEL NEVARREZ, | B235372 |
| Plaintiff and Respondent, | (Los Angeles Country Super. Ct. No. GC045033) |
| v. | |
| SAN MARINO SKILLED NURSING AND WELLNESS CENTRE et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles Country, C. Edward Simpson, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Niddrie, Fish & Addams and Michael H. Fish for Defendant and Appellant San Marino Skilled Nursing and Wellness Centre, LLP.

Wilson Getty, William C. Wilson and Mary P. Miller; Boudreau Williams and Jon R. Williams for Defendant and Appellant Country Villa Service Corp.

Hooper, Lundy & Bookman, Mark E. Reagan, Scott J. Kiepen and Felicia Y Sze for California Association of Health Facilities as Amicus Curiae on behalf of Defendants and Appellants.

Manatt, Phelps & Phillips, Barry S. Landsberg, Joanna S. McCallum and Andrew H. Struve for Covenant Care California , LLC as Amicus Curiae on behalf of Defendants and Appellants.

Moran Law, Michael F. Moran and Lisa Trinh Flint; Esner, Chang & Boyer, Stuart B. Esner, Andrew N. Chang and Holly N. Boyer for Plaintiff and Respondent.

McKenna Long & Aldridge, Charles A. Bird and Aaron T. Winn for AARP, California Advocates for Nursing Home Reform, Consumer Attorneys of California, Consumer Federation of California, Center for Medicare Advocacy, Inc., Congress of California Seniors, and the National Senior Citizens Law Center as Amici Curiae on behalf of Plaintiff and Respondent.

_____

San Marino Skilled Nursing and Wellness Centre, LLP (San Marino) and Country Villa Service Corp. (Country Villa) appeal from a judgment after a jury verdict in favor of Samuel Nevarrez[1] on theories of negligence, elder abuse based on reckless neglect (Welf. & Inst. Code, § 15657), and violation of the Patient's Bill of Rights (Health & Saf. Code, § 1430, subd. (b); Cal. Code Regs., tit. 22 § 72527).[2] We find no error in the trial court's rejection of appellants' jury instruction on clear and convincing evidence and in its refusal to instruct the jury with respect to state regulations on the use of restraints in nursing homes. However, we conclude the court abused its discretion in admitting into evidence a class A citation and a statement of deficiencies issued by the state Department

---

[1] Samuel Nevarrez died during the pendency of this appeal, and his wife Susan Schroeder Nevarrez was substituted as a party. References to Nevarrez are to Samuel Nevarrez.

[2] Health and Safety Code section 1430, subdivision (b) is the vehicle for vindicating rights set forth in the Patient's Bill of Rights (Cal. Code Regs., tit. 22 § 72527).

of Public Health (DPH) against San Marino.[3]  Because the erroneous admission of the citation prejudiced the jury verdict on negligence and elder abuse, we reverse that portion of the verdict and the related award of damages.  The evidentiary error did not affect the jury verdict on the Patient's Bill of Rights, and we affirm that portion of the verdict.  But we reverse the monetary award, which exceeds the amount authorized by Health and Safety Code section 1430, subdivision (b).  We also reverse the award of attorney fees and remand the case for further proceedings consistent with this opinion.

### FACTUAL AND PROCEDURAL SUMMARY

Country Villa operates nursing homes in California, including San Marino, a licensed nursing home.  Country Villa and San Marino have a management contract for operation of the nursing home.

Nevarrez was 79 years old when he was admitted to San Marino for rehabilitation on March 13, 2009.  He was alert, but had difficulty standing and walking and was at a high risk of falling.  Between March 20 and April 24, Nevarrez fell nine times while at the nursing home.  His falls usually occurred when he tried to get out of bed and go to the bathroom.

After the first fall, Nevarrez was assessed as having "[p]oor safety awareness/judgment," "[u]nsteady/poor gait," "attempt[ing] to function beyond ability," and "climb[ing] out of bed/chair."  The recommended measures were "[b]ed in lowest position," "[t]oileting program" (which required assisting Nevarrez with going to the bathroom every two hours or as needed), and "drug regimen review."

Nevarrez fell a second time on April 4.  He then was additionally assessed as being "forgetful," "impulsive," and poor at utilizing a safety device.  It was recommended that his walker be kept within reach.  After his third fall, on April 10, a lap belt "self-release" and a bed alarm were added.  Two days later, Nevarrez fell twice on

---

[3] The class A citation and the statement of deficiencies were admitted as exhibits 1 and 2.  We refer to these exhibits jointly as the citation.

the same day. A bedside commode with a urinal was added, as well as a tab alarm in bed. Since Nevarrez had lost his balance trying to unzip his pants, it was suggested the family provide pants with a Velcro closure.

On April 19, Nevarrez fell for the sixth time. Padded pants were recommended, but he refused to wear them. It was noted he was "very adamant with transferring and ambulating without assistance." The bedside commode was discontinued because Nevarrez refused to use it. After the seventh fall, on April 21, it was noted that Nevarrez was confused. A wheelchair alarm was added. He was to be monitored visually around the clock, but his room was not visible from the nurses' station. Nevarrez reported he fell again on April 23. The existing interventions were continued.

At about 1 a.m. on April 24, nurse De La Victoria and head nurse Cabral heard Nevarrez's bed alarm sound. By the time the nurses reached his room two minutes later, Nevarrez already was using the toilet. While nurse De La Victoria was shutting off the alarm, and head nurse Cabral stood in the doorway, Nevarrez lost his balance, hit his head on the wall, and fell. After this fall, he had to undergo brain surgery for a subdural hematoma, and later suffered a stroke. He was readmitted to San Marino between July and September 2009, and fell twice during his second stay at the facility.

In April 2010, Nevarrez filed a complaint alleging elder abuse under Welfare and Institutions Code section 15600 et seq., negligence, violation of Health and Safety Code section 1430, subdivision (b), willful misconduct, and violation of Penal Code section 368.

The case went to trial on the first three causes of action, and in March 2011, the jury returned a special verdict. On the cause of action for violation of the Patient's Bill of Rights, brought under Health and Safety Code section 1430, subdivision (b), the jury found the facility was inadequately staffed on six occasions and failed to provide Nevarrez with material information on eight occasions. The jury found Nevarrez was not subjected to physical or mental abuse. On the negligence claim, the jury found San Marino and Country Villa each 40 percent negligent and Nevarrez 20 percent comparatively negligent. On the elder abuse claim, the jury found, by clear and

4

convincing evidence, that Nevarrez's injuries were the result of reckless neglect, but it did not find fraud, malice or oppression. The jury awarded Nevarrez $1,191,007.90 for past medical expenses, $200,000 for future medical expenses, and $3,000,000 in general damages.

Several post-verdict motions were filed. In April 2011, the court awarded Nevarrez $7,000 as "penalties" against San Marino ($500 for each of the 14 violations of Health and Safety Code section 1430, subdivision (b) the jury had found and $952,142.50 in attorney fees. The court denied appellants' motions to reduce the non-economic damages to the $250,000 cap under the Medical Injury Compensation Reform Act (Civ. Code, § 3333.2) and to reduce the economic damages to amounts actually paid. After judgment was entered in May 2011, appellants moved for a new trial and judgment notwithstanding the verdict. The court denied these motions at a hearing in July 2011, but no minute order was filed.

This timely appeal followed. Appellants have joined in each other's briefs.

## DISCUSSION

### I

A party is entitled to request that the jury be instructed correctly on any theory of the case that is supported by substantial evidence. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) An erroneous refusal to instruct the jury is reversible if it is probable that the error prejudicially affected the verdict. (*Id.* at p. 580.)

A. *Clear and Convincing Evidence Instruction*

The trial court instructed the jury with CACI No. 201 that "[c]ertain facts must be proved by clear and convincing evidence which is a higher burden of proof. This means that the party must persuade you that it is highly probable that the fact is true." The court refused appellants' proposed instruction, which read: "Clear and convincing evidence requires a finding of high probability that the evidence be so clear as to leave no substantial doubt; sufficiently strong as to command the unhesitating assent of every reasonable mind." Appellants argue the trial court's refusal to give their proposed

5

instruction was prejudicial error requiring reversal of the elder abuse verdict, to which the higher burden of proof applied. We disagree.

Specifically, appellants contend the phrase "highly probable that the fact is true" in CACI No. 201 is misleading and unnecessarily limited without the additional language they proposed. The additional language was derived from *In re Angelia P.* (1981) 28 Cal.3d 908, where the California Supreme Court explained: "'Clear and convincing' evidence requires a finding of high probability. This standard is not new. We described such a test, 80 years ago, as requiring that the evidence be '"*so clear as to leave no substantial doubt*"; "*sufficiently strong to command the unhesitating assent of every reasonable mind.*"' [Citation.] It retains validity today." (*Id*. at p. 919, italics added.) Appellants argue the trial court was required to instruct the jury with the full description of the clear and convincing evidence standard set out in *In re Angelia P*.

Courts have rejected similar arguments directed at BAJI No. 2.62, which defines clear and convincing proof as "evidence of such convincing force that it demonstrates, in contrast to opposing evidence, a high probability of the truth of the fact[s] for which it is offered as proof[,]" without the additional language from *In re Angelia P*., *supra*, 28 Cal.3d 908. (See *People v. Mabini* (2001) 92 Cal.App.4th 654, 662 (*Mabini*); *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1165; *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847–850 (*Mattco Forge*); *Roberts v. Ford Aerospace & Communications Corp.* (1990) 224 Cal.App.3d 793, 804.)

In *Mabini*, the court explained that, in the early 1990's, Division Three of this appellate district had criticized BAJI No 2.62 in dicta. (*Mabini*, *supra*, 92 Cal.App.4th at p. 660, citing *Mock v. Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 332–333 & fn. 29; *DuBarry Internat., Inc. v. Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552, 566; *In re Marriage of Weaver* (1990) 224 Cal.App.3d 478, 487, fn. 8.) In a 2-1 decision in *Mattco Forge*, *supra*, 52 Cal.App.4th 820, 849, Division Three changed its position, finding that the more stringent language of *In re Angelia P*., *supra*, 28 Cal.3d 908, would impose "a burden approaching the criminal burden, proof beyond a reasonable doubt." In *Mabini*, at page 662, Division Six of our district agreed

6

with this analysis, and so do we.  Appellants' reliance on the criticism of BAJI No. 2.62 that the majority in *Mattco Forge* disavowed is unwarranted.

As the *Mabini* court explained:  "The key element of clear and convincing evidence is that it must establish a high probability of the existence of the disputed fact, greater than proof by a preponderance of the evidence.  Our Supreme Court recognized the importance of this element in *In re Angelia P.*, *supra*, 28 Cal.3d at page 919:  '"Clear and convincing" evidence requires a finding of high probability.'  More recently, our Supreme Court stated, 'Evidence of a charge is clear and convincing so long as there is a "high probability" that the charge is true. [Citations.]'  (*Broadman v. Commission on Judicial Performance* (1998) 18 Cal.4th 1079, 1090.)  In support of its statement, the court cited *In re Angelia P.*, *supra*, 28 Cal.3d at page 919, and BAJI No. 2.62.  (*Broadman v. Commission on Judicial Performance*, *supra*, 18 Cal.4th at p. 1090.)" (*Mabini*, *supra*, 92 Cal.App.4th at p. 662.)  The *Mabini* court concluded that "'[w]ithout an additional mandate from the Supreme Court or the Legislature, BAJI No. 2.62 remains a correct instruction.  [Citation.]'"  (*Id.* at p. 663, quoting *Mattco Forge*, *supra*, 52 Cal.App.4th at p. 849.)

We decline to hold that CACI No. 201 should be augmented to require that "the evidence must be 'so clear as to leave no substantial doubt' and 'sufficiently strong as to command the unhesitating assent of every reasonable mind.'"  Neither *In re Angelia P.*, *supra*, 28 Cal.3d 908, nor any more recent authority mandates that augmentation, and the proposed additional language is dangerously similar to that describing the burden of proof in criminal cases.  (*Mattco Forge*, *supra*, 52 Cal.App.4th at p. 849.)  The trial court did not err in rejecting it.

### B. Instructions on the Use of Restraints

Nevarrez argued at trial that he should have been restrained by a device fastening him to his bed or by the installation of side rails on the bed.  The facility administrator testified that side rails are considered a restraint when used to prevent a person who can walk from getting out of bed.  The interdisciplinary team which met after each of Nevarrez's falls considered side rails and other restraints inappropriate during his first

7

stay at San Marino since he was competent and could walk independently. The attending physician testified he did not recommend restraints or side rails. He explained that restraints cause more problems than they solve, such as agitation and skin tears. Side rails increase the risk of injury for patients who are able to get over them and then fall from the higher level of the side rails rather than the level of the bed.[4]

Nevarrez's expert testified that restraints, such as padded side rails, should have been implemented during the first stay at San Marino, and the failure to do so, or to formally require a written refusal of a restraint, fell below the standard of care. There was conflicting evidence whether restraints were discussed with Nevarrez and his family and whether he or the family refused them. But it was undisputed that he did not sign the form to formally refuse a restraint.

Appellants' special jury instructions 6 through 9 tracked the language of state regulations on the use of restraints. 6: "Restraints shall only be used with a written order of a licensed healthcare practitioner acting within the scope of his or her professional licensure." (former Cal. Admin. Code [now Cal. Code Regs.], tit. 22, § 72319, subd. (b).) 7: "The only acceptable forms of physical restraints shall be cloth vests, soft ties, soft cloth mittens, seat belts and trays with spring release devices. Soft ties means soft cloth which does not cause abrasion and which does not restrict blood circulation." (Cal. Code Regs., tit. 22, § 72319, subd. (c).) 8: "Restraints of any type shall not be used as punishment, as a substitute for more effective medical and nursing care, or for the convenience of staff." (Cal. Code Regs., tit. 22, § 72319, subd. (d).) 9: "The requirements for the use of physical restraints are: [¶] (1) Treatment restraints may be used for the protection of the patient during treatment and diagnostic procedures such as, but not limited to, intravenous therapy or catheterization procedures. Treatment restraints shall be applied for no longer than the time required to complete the treatment. [¶]

---

[4] Side rails were implemented after Nevarrez fell during his second admission at the facility, but the facility administrator testified that, by then, Nevarrez was unable to walk independently. His 11th fall was caused when he became agitated and kicked his bed while strapped in his wheelchair, causing the chair to tip backwards.

8

(2) Physical restraints for behavior control shall only be used on the signed order of a physician, or unless the provisions of section 1180.4(e) of the Health and Safety Code apply to the patient, a psychologist, or other person lawfully authorized to prescribe care, except in an emergency which threatens to bring immediate injury to the patient or others. In such an emergency an order may be received by telephone, and shall be signed within 5 days. Full documentation of the episode leading to the use of the physical restraint, the type of physical restraint used, the length of effectiveness of the restraint time and the name of the individual applying such measures shall be entered in the patient's health record." (Cal. Code Regs., tit. 22, § 72319, subd. (i)(1) & (2).)

The trial court rejected these instructions on the ground that the use-of-restraint regulations did not "rise to the level of law." This was incorrect. A party may "base instructions on relevant state or federal regulations" since "[l]ike statutes, applicable regulations are a 'factor to be considered by the jury in determining the reasonableness of the conduct in question.'" (*Conservatorship of Gregory* (2000) 80 Cal.App.4th 514, 523.)

The court was correct to question whether all use-of-restraint regulations were relevant. Instruction number 6, that restraints should be ordered by a physician, was relevant in light of the physician's refusal to order them during Nevarrez's first stay at the facility. But without any evidence of an emergency or of treatment requiring restraints, it is unclear why instruction number 9 was relevant. Similarly unclear is the relevance of instruction number 7, on acceptable forms of restraints, which does not list bed rails even though there was testimony that bed rails are considered a form of restraint. Appellants argue their "theory of defense was in particular the subject of" instruction number 8, "[r]estraints of any type shall not be used . . . as a substitute for more effective medical and nursing care, or for the convenience of staff." While this language may be relevant, the proposed instruction quoted the full language of the regulation, which also prohibits the use of restraints as punishment. (Cal. Code Regs., tit. 22, § 72319, subd. (d).) That particular use of restraints was not at issue in this case.

9

Neither were the proposed instructions, based solely on the text of the use-of-restraint regulations, appropriate pinpoint instructions. "In a proper instruction, '[w]hat is pinpointed is not specific evidence as such, but the *theory* of the defendant's case.' [Citation.]" (*People v. Wright* (1988) 45 Cal.3d 1126, 1137.) Appellants argue that they were entitled to these instructions since the evidence supported a defense of regulatory compliance. The use-of-restraint regulations, on their own, did not pinpoint that defense. Nor did they make clear that regulatory compliance "does not necessarily eliminate negligence"; instead, it "constitutes evidence for jury consideration with other facts and circumstances. [Citations.]" (*Hernandez v. Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1830–1831.)

"'Although a party is entitled to instructions on his theory of the case, if reasonably supported by the pleadings and the evidence, instructions must be properly selected and framed. The trial court is not required to give instructions which are not correct statements of the law or are incomplete or misleading.' [Citation.]" (*Conservatorship of Gregory*, *supra*, 80 Cal.App.4th at p. 522.) Unlike Nevarrez's instructions on negligence per se, which incorporated particular regulations that appellants were claimed to have violated, appellants' instructions were not properly framed as instructions on regulatory compliance. Limited as they were to the text of the use-of-restraints regulations, the proposed instructions were incomplete and misleading.

Respondent cites the proposition that, to be complete, instructions on regulatory compliance must make clear that such compliance is not a complete defense. (See *Dragash v. Western Pac. R. R. Co.* (1958) 161 Cal.App.2d 233, 241–242 [error to refuse plaintiff's instruction that defendant's statutory compliance is not complete defense]; *Pennington v. Southern Pac. Co.* (1956) 146 Cal.App.2d 605, 613 [same].) Appellants argue the cases show it was "incumbent upon" Nevarrez to seek clarifying instructions. That may have been the case had the court actually given appellants' use-of-restraint instructions. (See *Carrau v. Marvin Lumber & Cedar Co.* (2001) 93 Cal.App.4th 281, 296–297 [objection or qualifying instruction required to avoid waiver when jury instruction incomplete].) But the court was not required to give the use-of-restraint

10

instructions if they were incomplete, and the doctrine of waiver does not apply. The instruction that following a custom and practice does not excuse unreasonable conduct did not independently supply the missing element of appellants' instructions, since customs and practices do not necessarily derive from statutes and regulations.

We conclude that the court did not err in rejecting appellants' proposed jury instructions based on the use-of-restraints regulations. Some of the regulations appear to have been irrelevant, and none was framed as an instruction on regulatory compliance. As proposed, the instructions did not provide guidance to the jury on how appellants' theory of defense would apply.

II

Appellants argue the entire jury verdict was tainted by the erroneous admission into evidence of the citation issued by the DPH. We review a trial court's ruling on the admissibility of evidence for abuse of discretion. (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1111.) The error is reversible if it resulted in a miscarriage of justice. (*Id.* at p. 1114.)

*A. Citation*

San Marino self-reported Nevarrez's April 24, 2009 fall to the DPH, and a DPH investigator issued a class A citation and a statement of deficiencies on March 2, 2010. Under the Long-Term Care, Health, Safety, and Security Act of 1973 (Health & Saf. Code, § 1417 et seq., "the Long-Term Care Act"), class A citations are issued when a nursing facility is determined to have violated a state or federal law or regulation relating to its operation or maintenance and the violation presents imminent danger or substantial probability of death or serious harm to a patient or resident. (Health & Saf. Code, §§ 1423, subd. (a), 1424, subd. (d); see *California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 291.)[5] Both the class A citation

---

[5] The most serious, Class AA, citation is issued when the violation is a "direct proximate cause of death of a patient or resident." (Health & Saf. Code, § 1424, subd. (c).) Class B citations are issued for less serious violations that have "direct or immediate relationship to the health, safety, or security of . . . patients or residents." (*Id.*,

11

and the statement of deficiencies were based on violations of a federal regulation applicable to facilities participating in Medicare and Medicaid, which requires such facilities to ensure: "(1) The resident environment remains as free of accident hazards as is possible; and [¶] (2) Each resident receives adequate supervision and assistance devices to prevent accidents." (42 C.F.R. § 483.25(h).) The DPH investigator who issued them found that Nevarrez was not provided with "adequate supervision and assistance in accordance with his care plan to prevent accidents" when San Marino failed to "[v]isually monitor [him] around the clock as indicated in the resident's care plan" and "[r]espond and provide supervision assistance in a timely manner when the personal alarm (which should have alerted staff that [Nevarrez] required assistance) became activated." The class A citation contained the additional finding that the violations "presented a substantial probability that death or serious physical harm would result."

The citation included the nursing home's plan of corrections, as well as the investigator's review of Nevarrez's records, three staff declarations, and an exit interview with the facility's administrator. It also included the investigator's conclusion that the April 24, 2009 fall could have been averted had staff answered Nevarrez's alarm right away and that it caused Nevarrez to sustain a subdural hematoma which required an emergency craniotomy and hospitalization.

### B. Trial Court Proceedings

Nevarrez moved in limine to admit the citation into evidence. He argued it was admissible to establish negligence per se under *Norman v. Life Care Centers of America, Inc.* (2003) 107 Cal.App.4th 1233 (*Norman*), and it fell within the exception to the

---

§ 1424, subd. (e).) The Department of Health Services (DHS), which used to administer the Long-Term Care Act, was reorganized into the DPH and the Department of Health Care Services as of July 1, 2007. (See *California Assn. of Health Facilities v. Department of Health Services*, *supra*, 16 Cal.4th at p. 291; *Woods v. Horton* (2008) 167 Cal.App.4th 658, 664, fn. 2.)

hearsay rule for official records. (Evid. Code, § 1280.)[6] Appellants opposed, and in turn moved to keep the citation out. They argued the class A citation was not final because it was on appeal, and the plan of correction was inadmissible, as were the investigator's opinions and conclusions. They also objected to the admission of the citation under Evidence Code section 352.

At the hearing on the motions in limine, appellants' counsel argued the DPH investigator's opinions and conclusions improperly encroached on the jury's role as a fact finder. The court noted it was "troubled by the admissibility of the actual citation" and intended to look into the issue further. It granted appellants' motion in limine to preclude the parties' experts from expressing opinion whether appellants violated any particular statute or regulation. The next day, the court granted Nevarrez's motion in limine to introduce the citation, ordering only that any hearsay statements within it be redacted. The court stated its ruling was consistent with *Norman*, *supra*, 107 Cal.App.4th 1233, where a DHS representative testified to his finding of violations at a nursing home. Appellants' counsel questioned whether, under the court's ruling, the DPH investigator would be allowed to testify about his opinion that the violation of the federal regulation satisfied the requirement for a class A citation. The court responded it would "have to take that up . . . more in the context of the testimony."

At trial, a custodian of records testified generally that the citation was an official DPH record. When it became clear that the DPH investigator who issued the citation would not testify,[7] appellants' counsel renewed his objection, arguing the citation

---

[6] Nevarrez also sought to introduce several pre-2009 deficiencies, none of which is relevant to this appeal.

[7] The record shows that Nevarrez subpoenaed the DPH investigator. Because he performed a Medicare survey, the investigator was considered an employee of the Department of Health and Human Services (DHHS), Centers of Medicare and Medicaid Services, a federal agency. The agency requested the withdrawal of the subpoena in light of a federal regulation (45 C.F.R. § 2.3) that described the procedure for requesting authorization of testimony by DHHS employees. Nevarrez's subsequent request for such

13

contained the investigator's opinion on ultimate issues regarding negligence and neglect, and appellants were prejudiced because they had no opportunity to cross-examine the investigator regarding his qualifications and findings.

The court overruled the objection, ruling the citation admissible under Evidence Code section 1280. The court quoted a passage from the California Evidence Benchbook: "It is the decisional law generally that evidence of a statement of opinion in a writing that otherwise qualifies as an official record made by a public employee or as an official record of a birth, fetal death, death or marriage is admissible under the official records exception to the hearsay rule. If, one, the statement of opinion is primarily based on the declarant's personal observation; and, two, the statement of opinion is one that would be admissible if testified to by the declarant in court." (See 1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. 2009) Exceptions to Hearsay Rule, § 5.14, p. 155.)

The citation was redacted to remove references to the three staff declarations. The plan of corrections, the reference to the exit interview with the facility's administrator, and the investigator's opinions and conclusions were not redacted. The citation was referenced repeatedly during the examination of various witnesses, and was the cornerstone of the closing argument by Nevarrez's counsel. Counsel claimed generally: "[T]he state came in and investigated the facts. [¶] . . . [DPH] came in and conducted their investigation, exhibit one in this case is the class A citation. [¶] . . . [¶] Credibility of the evidence on liability or fault, we have the state's class A citation the highest citation that can be delivered against a nursing home in a live plaintiff. [¶] If the defense wanted to challenge that, this is the place to do it. Call witnesses, subpoena the investigator from DPH . . . [The] class A citation is an official document and it's just like we had somebody up there repeating it 20 times over . . . ."

Counsel argued the citation "already determined" there were violations of the Patient's Bill of Rights. He also argued there was negligence per se "because of the class

authorization was denied on the ground that the investigator's testimony "would not be in the interests" of the DHHS.

14

A and the deficiency." The jury was given a negligence per se instruction specifically incorporating the violations on which the citation was based. With respect to this instruction, counsel told the jury: "[S]o if you look at exhibit one, that class A citation, you'll see this is the specific violation[;] the regulation[] has already been deemed violated, it's been found by the department that has nurses and doctors that review it, work it up, and issue . . . , so that's why, and I don't mean any cavalier approach actually to the jury, but the bill of rights and the negligence issues have largely been determined for you." Counsel argued the citation determined the issue of causation since the investigator stated "these violations presented . . . a substantial probability that death or serious physical harm would result." Counsel told the jury: "The only thing that wasn't determined in the class A is, is this an elder abuse case. You folks decide this." But despite this disclaimer, counsel led his argument on elder abuse with the citation and referred the jury to his earlier discussion of causation.

In their motions for a new trial and judgment notwithstanding the verdict, appellants argued the citation did not meet the official record exception requirements in section 1280 because it was not based on the investigator's personal knowledge and its contents therefore were not trustworthy. The court stated the evidence was admitted to establish that a citation had been issued, rather than to establish the truth of the contents of the citation.

### C. Analysis

#### 1. Abuse of Discretion

"A court abuses its discretion if its ruling is '"so irrational or arbitrary that no reasonable person could agree with it."' [Citation.] A court's discretion also is limited by the applicable principles of law. [Citation.]" (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 187.)

In initially ruling that the citation was admissible, the court relied on *Norman*, *supra*, 107 Cal.App.4th 1233. That reliance was misplaced. *Norman* held the trial court in that case erred in refusing to give a negligence per se instruction when that instruction was supported by a DHS investigator's testimony that he found the defendant nursing

15

home had violated certain regulations. (*Id*., at pp. 1243, 1247–1248.) The *Norman* court did not address the admissibility of the DHS investigator's testimony. A case is not authority for a proposition the court did not consider. (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388.) Although the DHS investigator was allowed to testify to his conclusions, *Norman* does not render such testimony per se admissible. Similarly, in *Sababin v. Superior Court* (2006) 144 Cal.App.4th 81, 90, the court found that a deficiency issued by the DHS raised triable issues of material fact regarding elder abuse. But the court did so in the absence of an objection to the admissibility of DHS's records and expressly declined to hold that the records were "per se admissible." (*Id*. at p. 89, fn. 8.) In contrast, here the trial court was specifically asked to decide whether the citation was admissible. By relying on *Norman*, the court in essence avoided doing so.

Respondent argues the citation is admissible under the official records exception. (Evid. Code, § 1280.) That section provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

Respondent argues the trustworthiness of the citation was established by the custodian of records, and the statutory presumption that official duties are properly performed (Evid. Code, § 664) shifted the burden to appellants to show the DPH investigator failed to accurately observe and record events. Appellants argue the citation lacks trustworthiness because it was issued a year after the April 24, 2009 incident and was based on the investigator's review of records and statements by San Marino staff. Indeed, with the exception of the investigator's personal observation that Nevarrez's room was 18 to 20 yards away and around a corner from the nurses' station, the citation relies on other sources of information, none of which qualifies for the official duties presumption. Because of that, the citation is not comparable to reports by public officers

16

that are based on observations of other public employees. (See, e.g., *Rupf v. Yan* (2000) 85 Cal.App.4th 411, 430, fn. 6.)

The most prejudicial parts of the citation were the investigator's conclusions and the plan of correction, since the rest was either redacted, cumulative to other evidence adduced at trial, or not hearsay. There was no justification for not ordering the plan of correction redacted. Under Health and Safety Code section 1280, subdivision (f), plans of correction are not admissions by a party opponent, and they also are subject to exclusion as remedial measures under Evidence Code section 1151.

As to the investigator's opinions and conclusions, appellants relied on *Pruett v. Burr* (1953) 118 Cal.App.2d 188, 201 to argue that "'[n]otwithstanding the general rule that public records and reports are admissible in evidence, the courts almost universally exclude statements contained in such reports or records concerning the cause of or responsibility for an injury to the person or damage to property.' . . . 'One ground on which such a report is excluded is that the statement as to the cause of or responsibility for the occurrence is a mere statement of opinion, and that since the officer or employee would not be permitted to state his opinion if on the witness stand, there is all the more reason for excluding his statement of opinion when he is not under oath and is not subject to cross-examination.'" The court admitted the citation on the assumption that the investigator's opinions were admissible because they were based on the investigator's own observations. This assumption was inconsistent with the court's ruling that the citation be redacted to remove any hearsay. That ruling indicated the investigator's opinions were not solely or primarily based on his own observations or on admissible hearsay.

The court assumed the investigator would have been allowed to testify to his opinions at trial. This assumption was inconsistent with the court's ruling that the parties' experts could not testify whether a statute or regulation had been violated. Admissible expert opinion testimony is not objectionable just because it embraces the ultimate issue to be decided by the trier of fact. (See Evid. Code, § 805.) But there are limits to such testimony. "'[T]he rationale for admitting opinion testimony is that it will

assist the jury in reaching a conclusion called for by the case. "Where the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates." [Citation.]' [Citations.]" (*Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1183 (*Summers*).) Additionally, an expert may not testify about issues of law or draw legal conclusions. (*Id*. at p. 1178.)

In ruling that the parties' experts could not testify that appellants violated any particular laws, the court apparently agreed that such testimony would be an improper legal conclusion and would interfere with the jury's function as fact finder. The correctness of this ruling has not been challenged. Whether or not the DPH investigator qualified as an expert witness, there would have been no rational basis for treating him any differently than the parties' expert witnesses with respect to offering an opinion that San Marino violated the law.

Additionally, the admission of the class A citation created the risk that it would be used to establish not only that a regulation was violated for purposes of negligence per se, but to insinuate, as Nevarrez's counsel did, that appellants must be liable because "the state" issued San Marino "the highest citation that can be delivered against a nursing home," short of a citation based on a resident's death. Appellants initially objected under Evidence Code section 352. The record does not indicate that the court balanced the probative value of the citation against the danger of undue prejudice or jury confusion. Although appellants have not specifically cited Evidence Code section 352 on appeal, they complain that the citation was largely used to predetermine the case and confuse the jury. We agree, and conclude that the trial court abused its discretion in admitting it into evidence.

## 2. Prejudice

A miscarriage of justice occurs if, based on the entire record, including the evidence, it is reasonably probable the jury would have reached a result more favorable to appellants absent the error. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)

18

"'"[P]robability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' [Citation.]" (*Ibid.*)

Appellants argue the citation was used to establish their liability on all three causes of action. We examine the alleged prejudicial effect on each of cause of action separately.

### a. Violation of the Patient's Bill of Rights

Health and Safety Code section 1430, subdivision (b) allows a resident or patient of a skilled nursing facility to "bring a civil action against the licensee of a facility who violates any rights of the resident or patient as set forth in the Patient's Bill of Rights in Section 72527 of Title 22 of the California Code of Regulations, or any other right provided for by federal or state law or regulation." Appellants argue the jury's finding of 14 violations of the Patient's Bill of Rights should be reversed because the citation was the centerpiece of the closing argument by Nevarrez's counsel. Nevarrez's counsel did argue the citation already had determined that the Patient's Bill of Rights was violated. But the special verdict indicates the jury was not misled by this argument.

One alleged violation was of the right to be "free from mental and physical abuse." (Cal. Code Regs., tit. 22, § 72527, subd. (a)(9).) Nevarrez's counsel argued that the citation "unequivocally answered" that such a violation occurred. The jury rejected counsel's argument, finding that Nevarrez was not subjected to mental and physical abuse.

Another alleged violation was of Health and Safety Code section 1599.1, subdivision (a), which is incorporated by reference in the Patient's Bill of Rights. (Cal. Code Regs., tit. 22, § 72527, subd. (a)(25).) The statute provides: "The facility shall employ an adequate number of qualified personnel to carry out all of the functions of the facility." (Health & Saf. Code, § 1599.1, subd. (a)). The jury found the facility was inadequately staffed on six days. This finding was not based on the citation, which did not address understaffing. Rather, the finding was based on the testimony of Nevarrez's expert about nursing hours reflected in a "key factor report," which both counsel referenced in closing argument.

19

The third alleged violation was of the right "[t]o receive all information that is material to an individual patient's decision concerning whether to accept or refuse any proposed treatment or procedure. The disclosure of material information for administration of . . . physical restraints . . . shall include the disclosure of information listed in Section 72528(b)." (Cal. Code Regs., tit. 22, § 72527, subd. (a)(5).) This requires disclosing "[t]hat the patient has the right to accept or refuse the proposed treatment, and if he or she consents, has the right to revoke his or her consent for any reason at any time." (Cal. Code Regs., tit. 22, § 72528, subd. (b)(6).) The citation said nothing about restraints or disclosure of information, and Nevarrez's counsel did not argue that it established a violation of these regulations. Instead, counsel focused on the undisputed evidence that Nevarrez had not signed a form either accepting or refusing restraints. Based on that, counsel argued restraints were never offered to Nevarrez during his first stay at the facility. The jury found that San Marino failed to disclose material information on eight occasions.

There is no indication that the citation played any role in the jury's findings under the Patient's Bill of Rights. The citation was not based on a violation of a right set forth in the Patient's Bill of Rights, and the jury apparently rejected the invitation by Nevarrez's counsel to defer to the citation, relying instead on other evidence counsel highlighted in his closing argument. We find no prejudice under the circumstances. Since appellants do not challenge the jury verdict with regard to the Patient's Bill of Rights on any other ground, we affirm that verdict.

### b. *Negligence*

Under the negligence per se doctrine, negligence is presumed if "(1) [the defendant] violated a statute, ordinance, or regulation; (2) the violation proximately caused death or injury to [the plaintiff]; (3) the death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and (4) the [plaintiff] . . . was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted." (Evid.Code, § 669, subd. (a).) The first two elements are questions of fact for the jury to decide if there are factual disputes.

20

(*Padilla v. Pomona College* (2008) 166 Cal.App.4th 661, 675.) The second two elements are questions of law to be resolved by the court. (*Norman*, *supra*, 107 Cal.App.4th at pp. 1246–1248.) The presumption of negligence may be rebutted "by proof that the violator did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law. [Citation.]" (*Id.* at p. 1246.)

Each of the negligence per se instructions given in this case incorporated either a regulation or a statute that Nevarrez claimed appellants had violated. These included three state regulations and one state statute: "Each facility shall employ sufficient nursing staff to provide a minimum of 3.2 nursing hours per patient day" (Cal. Code Regs., tit. 22, § 72329.1, subd. (f).); "[n]ursing service shall include, but not be limited to, the following: . . . [¶] Implementing of each patient's care plan according to the methods indicated. Each patient's care shall be based on this plan" (Cal. Code Regs., tit. 22, § 72311, subd. (a)(2)); "[p]atients shall have the right . . . [¶] . . . to be free from mental and physical abuse" (Cal. Code Regs., tit. 22, § 72527, subd. (a)(9)); and "[t]he facility shall employ an adequate number of qualified personnel to carry out all of the functions of the facility" (Health & Saf. Code, § 1599.1, subd. (a)). The negligence per se instructions also incorporated the federal regulation on which the citation was based: "The facility must ensure that— [¶] (1) The resident environment remains as free of accident hazards as is possible; and [¶] (2) Each resident receives adequate supervision and assistance devices to prevent accidents." (42 C.F.R. § 483.25(h).)

As to each negligence per se instruction, the jury was told: "If you decide that San Marino Skilled Nursing and/or Country Villa violated this law, and two, that the violation was a substantial factor in bringing about the harm, then you must find that San Marino Skilled Nursing and/or Country Villa was negligent unless you also find that the violation was excused. [¶] If you find that San Marino Skilled Nursing and/or Country Villa did not violate this law, or that the violation was not a substantial factor in bringing about the harm, or if you find the violation was excused, then you still must decide whether San

21

Marino Skilled Nursing and/or Country Villa was negligent in light of the other instructions."

In closing argument, Nevarrez's counsel referred the jury to the citation, arguing that DPH, which "has nurses and doctors" who work up, review and issue citations, already had found a regulatory violation, so that the "negligence issues have largely been determined for you." Similarly, counsel argued DPH already had determined the issue of causation. The jury found appellants negligent, but the special verdict form does not indicate under what theory.

Since the jury was instructed that it could find defendants negligent based solely on the violations of the federal regulation on which the citation also was based, and counsel represented to the jury that DPH already had determined the negligence issues, it is reasonably probable that the citation influenced the jury's decision on negligence. This is so also because Nevarrez's counsel insinuated that the citation, a result of a "state" investigation of the facts, impeached the credibility of appellants' expert witnesses, whom counsel characterized as "hired experts." (See *Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1040 [verdict tainted by use of inadmissible evidence to impeach plaintiff's credibility].) The citation was offered essentially as an endorsement by the government of Nevarrez's case against appellants.

The DPH investigator's findings were that the facility failed to visually monitor Nevarrez around the clock, contrary to his care plan, and failed to respond to his personal alarm in a timely manner. These findings were not overwhelmingly supported by the evidence. Rather, the evidence was in dispute whether around-the-clock visual monitoring was part of Nevarrez's care plan at the time of his ninth fall, on April 24, 2009. The facility administrator testified visual monitoring was an unusual measure that was implemented for 24 hours after the April 21 fall. It was not listed among the intervention measures to be continued after the April 23 fall. Appellants' expert testified that the standard of care did not require constant monitoring.

Also disputed was whether the nurses' response on April 24 was inappropriate. Appellants' expert testified the two-minute response by two staff members was prompt.

22

Nurse De La Victoria testified Nevarrez already was using the toilet and appeared to be stable on his feet when staff arrived. The expert testified the decision not to approach "a male resident standing at the commode urinating" was "a nursing judgment." The jury's ability to assess the credibility and weight to be given this testimony was compromised since it was told that, in the citation, "the state" already had determined the issue of negligence. As used by Nevarrez's counsel, the citation in essence shifted responsibility for decision on this issue to the state agency. (See *Summers*, *supra*, 69 Cal.App.4th 1155, 1182–1183 [witness' expression of general belief how case should be decided is inadmissible legal conclusion, of no value to trier of fact, and shifts responsibility for decision to witness].)

Of the other negligence per se theories, one was based on a violation of the right to be free from mental and physical abuse. (Cal. Code Regs., tit. 22, § 72527, subd. (a)(9).) As we have explained, the jury expressly found this provision of the Patient's Bill of Rights was not violated, and it is unlikely that the negligence verdict could have been based on this theory.

Two other negligence per se theories were premised on violations of staffing laws. (Health & Saf. Code, § 1599.1, subd. (a); Cal. Code Regs., tit. 22, § 72329.1, subd. (f).) While the jury found six violations of the Patient's Bill of Rights based on understaffing, the cause of action under Health and Safety Code section 1430, subdivision (b) did not require it to determine causation. But causation was required for the finding of negligence. De La Victoria testified the delay in his response to Nevarrez's alarm was due to the fact that he was helping another patient. He also testified fewer nurses were working that night shift. But whether understaffing caused De La Victoria's delay in response was disputed, as was whether the delay caused Nevarrez's injury. Yet, the DPH investigator concluded the two-minute delay in responding to Nevarrez's alarm was unreasonable and as a result Nevarrez was injured. Counsel argued to the jury that the DPH determined the issue of causation. Thus, it is reasonably probable that the jury's finding of causation on this theory was influenced by the citation. Another negligence per se theory was based on a violation of a state regulation regarding the implementation

23

of a patient's care plan.  (Cal. Code Regs., tit. 22, § 72311, subd. (a)(2).)  That theory also overlapped with one of the violations found by the DPH investigator.  Thus, none of the theories on which the negligence verdict could have been based was insulated from the effect of the citation.

We conclude the citation tainted the verdict on negligence, and we reverse that part of the verdict, along with the jury award of damages.[8]

### c.  Elder Abuse

"The Elder Abuse Act makes certain enhanced remedies available to a plaintiff who proves abuse of an elder, i.e., a 'person residing in this state, 65 years of age or older.'  (Welf. & Inst. Code, § 15610.27.)  In particular, a plaintiff who proves 'by clear and convincing evidence' both that a defendant is liable for physical abuse, neglect or financial abuse (as these terms are defined in the Act) and that the defendant is guilty of 'recklessness, oppression, fraud, or malice' in the commission of such abuse may recover attorney fees and costs.  (*Id*., § 15657, subd. (a).)"  (*Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 404 (*Carter*).)  As defined in the Act, neglect is "[t]he negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." (Welf. & Inst. Code, § 15610.57, subd. (a)(1).)  "Recklessness involves "'deliberate disregard" of the "high degree of probability" that an injury will occur' and 'rises to the level of a "conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it."'  [Citation.]"  (*Carter*, at p. 405.)  To recover enhanced remedies under the act, "a plaintiff must prove more than simple or even gross negligence in the provider's care or custody of the elder.  [Citation.]"  (*Ibid*.)

The jury found neglect and recklessness by clear and convincing evidence.  Respondent argues the citation was merely cumulative and the jury verdict was overwhelmingly supported by other evidence.  We agree with appellants that it begs the

---

[8] Because we reverse the jury award of damages, we do not reach appellants' challenges to the amount of damages.

question why Nevarrez's counsel relied so heavily on the citation and urged the jury to do the same if the evidence were indeed overwhelming.

Respondent's claim that the facility never assisted Nevarrez on his trips to the bathroom is not supported by the record, which indicates that he was provided with "limited assists" on transfers from his bed "to the chair to the wheelchair to the toilet." As we have discussed, the appropriateness of using restraints during Nevarrez's first stay at the facility was disputed, as was the promptness and appropriateness of the two nurses' response on the night of his ninth fall. Whether the facility was understaffed also was disputed, as was the relevance of understaffing and other alleged violations, to Nevarrez's injury. As with negligence, a finding of causation was required for elder abuse, and Nevarrez's counsel argued to the jury that the DPH already had determined the issue of causation.

We conclude that the erroneous admission of the citation tainted the jury verdict on elder abuse, and we reverse that portion of the verdict.[9] We also reverse the court's award of $952,142.50 in attorney fees. Although the court noted the award was authorized for violations of both the Elder Abuse Act (Welf. & Inst. Code, § 15657, subd. (a)) and Health and Safety Code section 1430, subdivision (b), it did not apportion the award. On remand, the court should award reasonable attorney fees against San Marino, the only defendant named in the cause of action under Health and Safety Code section 1430, subdivision (b).

### III

Health and Safety Code section 1430, subdivision (b) (hereafter, section 1430, subdivision (b)) allows a current or former resident or patient to sue the licensee of a facility that "violates any rights" set forth in the Patient's Bill of Rights (Cal. Code Regs., tit. 22, § 72527). The licensee is liable for up to $500, and for costs and attorney fees, and the violation may be enjoined. (§ 1430, subd. (b).) As we have explained, the jury

---

[9] Because we reverse based on evidentiary error, we do not consider appellants' argument that the verdict on elder abuse was not supported by substantial evidence.

25

found San Marino was understaffed on six occasions and failed to offer Nevarrez restraints on eight. The trial court awarded $7,000 against San Marino, $500 for each of the 14 violations the jury found. We granted respondent's petition for a rehearing on the question whether the $7,000 award is authorized by the statute.[10] After considering the parties' supplemental briefs and several amicus curiae briefs,[11] we again conclude that the statute allows a single award of up to $500 per lawsuit. The $7,000 award is, therefore, excessive.

At the outset we deal with respondent's argument that the excessiveness of the award is not an issue properly before us. It was raised as part of Country Villa's challenge that attorney fees were too high because they were based in part on the $7,000 award. Respondent contends County Villa lacked standing to make that claim. Although County Villa is not a named defendant in the section 1430, subdivision (b) cause of action, San Marino is, and San Marino joined in Country Villa's brief under California Rules of Court, rule 8.200(a)(5). The question was briefed by the proper parties. It is properly before us.

Respondent also contends the amount of attorney fees did not depend on the amount awarded under section 1430, subdivision (b). A trial court determines the amount of reasonable attorney fees by considering factors such as "the nature of the

---

[10] The trial court granted Nevarrez's "motion to set civil penalties award" against San Marino under section 1430, subdivision (b). No one questioned the characterization of the award as "penalties." The issue whether it should be characterized as damages is, thus, not before us. (Cf. *Shuts v. Covenant Holdco LLC* (2012) 208 Cal.App.4th 609, 625, fn. 9 (*Shuts*) [declining to consider whether award under section 1430, subdivision (b) is civil penalty].)

[11] We permitted the American Association of Retired Persons (AARP), California Advocates for Nursing Home Reform, Consumer Attorneys of California, Consumer Federation of California, Center for Medicare Advocacy, Inc., Congress of California Seniors, and the National Senior Citizens Law Center (collectively, the AARP amici) to file a joint amicus curiae brief in support of respondent's petition for rehearing. The California Association of Health Facilities (CAHF) and Covenant Care California, LLC, were permitted to file amicus curiae briefs in support of appellants.

26

litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case. [Citation.]" (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096.)  Here, the trial court expressly based the attorney fee award, in part, on the "results achieved."  The $7,000 award under section 1430, subdivision (b) is dwarfed by the jury's damages award, but since we reverse the jury award, the trial court will need to re-determine the amount of attorney fees solely based on the result achieved under section 1430, subdivision (b).  Whether that result includes an award of $7,000 or $500 will be relevant on remand.

We turn to section 1430, subdivision (b).  "'Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning.  We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.'  [Citation.]" (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724.)

*A.  The Language*

Our statutory analysis begins with the plain language of the statute, and if that language is unambiguous, the inquiry ends there.  (*Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1394.)  Section 1430, subdivision (b) permits a current or former resident or patient of a skilled nursing facility to bring "a civil action" against the licensee of a facility that "violates any rights" set forth in the Patient's Bill of Rights (Cal. Code Regs., tit. 22, § 72527), or "any other right provided for by federal or state law or regulation."  Its remedy provision states that "[t]he licensee shall be liable for up to five hundred dollars ($500), and for costs and attorney fees, and may be enjoined from permitting the violation to continue."  (§ 1430, subd. (b).)  The provision does not

27

expressly provide that the licensee's monetary liability is capped at $500 per violation, and the parties disagree on its application in this case, where the jury found multiple violations of more than one right.

Appellants contend we should not read the phrase "per violation" into section 1430, subdivision (b) since the Legislature did not include it here but did include it in statutes providing for civil penalties in other contexts. (See, e.g., Health & Saf. Code, §§ 1280.1, subd. (a) [penalty of up to 25,000 "per violation"]; 1317.6, subd. (c) [penalty of up to $5,000 "for each violation"]; 1548, subd. (b) [penalty of up to $150 "per day per violation"]; 1798.210, subd. (a) [fine of up to 2,500 "per violation"].) We agree. Indeed, the general rule is that in construing a statute, we are not permitted to "insert qualifying provisions not included" in the statute, nor edit it """"to conform to an assumed intention which does not appear from its language. [Citation.]"""' (*Cadlerock Joint Venture, L.P. v. Lobel* (2012) 206 Cal.App.4th 1531, 1549.)

Respondent argues that, when read together, the monetary and injunctive relief provisions of section 1430, subdivision (b) apply to the same violation: "The licensee shall be liable for up to five hundred dollars ($500) . . . and may be enjoined from permitting the violation to continue." Thus, respondent would have us find that the statute's syntax supports application of the monetary relief provision on a "per violation" basis. This interpretation is frustrated by the intervening reference to "costs and attorney fees," as these are awarded to the prevailing party in a civil action, but not on a "per violation" basis. (See Code Civ. Pro., § 1032, subd. (b) [prevailing party entitled to recover costs "in any action"]; § 1033.5, subd. (a)(10)(B) [costs include attorney fees when authorized by statute].)

*B. Statutory Scheme*

Section 1430 is part of the Long-Term Care Act, which also sets up the administrative enforcement scheme we discussed with regard to the class A citation issued in this case. Under that scheme, violations directly related to health, safety or security are class B violations. Those presenting imminent danger or substantial probability of death or serious injury are class A violations, which become class AA

28

violations if they cause death. (Health & Saf. Code, § 1424, subd. (c)-(e).) Each of these classes is subject to a range of administrative penalties. [12] Violations with only a minimal relationship to health, safety, or security are administratively classified as "class 'C' violations." (Cal. Code Regs., tit. 22, § 72701.) They are not subject to an administrative penalty.

Section 1430, subdivision (a) allows a civil action for damages and injunctive relief by the Attorney General in cases of unresolved class A or B violations. Under that subdivision, "a licensee who commits a class 'A' or 'B' violation may be enjoined from permitting the violation to continue" and may be sued for civil damages up to "the maximum amount of civil penalties that could be assessed on account of the violation or violations." (§ 1430, subd. (a).) Thus, the violations subject to this subdivision and the monetary recovery for them in a lawsuit by the Attorney General are expressly tied to the administrative penalty scheme.

Section 1430, subdivision (b) supplements administrative enforcement by creating a private right of action under statutes and regulations that do not themselves confer such a right. (See *Shuts*, *supra*, 208 Cal.App.4th at p. 624.) On its face, it is not tied to the administrative scheme of the Long-Term Care Act. Unlike its companion subdivision (a), subdivision (b) does not reference class A or B violations even though a violation of the Patient's Bill of Rights (Cal. Code Regs., tit. 22, § 72527) may be a class B violation if it causes "significant humiliation, indignity, anxiety, or other emotional trauma to a patient." It also may be a class A violation if there is imminent danger or substantial

---

[12] Class B violations currently carry a penalty of $100 to $1,000 "for each and every citation." (Health & Saf. Code, § 1424, subd. (e).) Skilled nursing facilities and some intermediate care facilities are subject to a penalty of between $2,000 and $20,000 "for each and every citation" based on a class A violation and between $25,000 and $100,000 "for each and every citation" based on a class AA violation. (Health & Saf. Code, § 1424.5, subd. (a).) When subdivision (b) was added to section 1430 in 1982, the penalties for class B violations were between $50 and $250 and for class A violations between $1,000 and $5,000 "for each and every violation." (Legis. Com. com., Deering's Ann. Health & Saf. Code, (2010 ed.) foll. § 1424, pp. 443–444; see *Lackner v. St. Joseph Convalescent Hospital, Inc.* (1980) 106 Cal.App.3d 542, 547 (*Lackner*).)

29

probability of death or serious injury. (Health & Saf. Code, § 1424, subd. (d)-(e).) Conversely, if only minimally related to health, safety, or security, it may be a class C violation. (See Cal. Code Regs., tit. 22, § 72701.)

Thus, section 1430, subdivision (b) apparently covers a broader spectrum of violations than subdivision (a). Some of these violations are not subject to administrative penalties at all, while others carry a broad range of such penalties and allow recovery of a broad range of damages in a civil action by the Attorney General. Because subdivision (b) is "distinct from the administrative enforcement of the Act" (*California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 302), the fact that greater penalties or damages may be available in a public enforcement proceeding is not a reason to apply the $500 maximum in subdivision (b) "per violation."

Indeed, it is a reason not to do so. When subdivision (b) was added to section 1430, administrative penalties were expressly to be assessed "for each and every violation." (See *Lackner*, *supra*, 106 Cal.App.3d at p. 547.) The absence of this phrase from subdivision (b) supports the inference that the phrase was intentionally left out of that subdivision, especially in light of the regularity with which it appears in penalty provisions throughout the Health and Safety Code. The Long-Term Care Act provides a comprehensive scheme for the attainment of its objectives, including both public and private remedies. The fact that the private monetary remedy is not greater reflects a legislative choice with respect to that remedy, rather than a basis for a court to enhance the statutory scheme. As we shall discuss, the $500 monetary remedy is not the only and certainly not the costliest of the private remedies. The prevailing party also is entitled to attorney fees, which, depending on the case, may far exceed the amount paid to the plaintiff.

*C. Legislative History*

The parties and amici have asked us to take judicial notice of a large quantity of materials from the legislative record, which they claim ought to guide our construction of the statute. We have examined them, and find them of little help. They largely reflect advocacy positions, as well as unsuccessful efforts to revise the enacting legislation and

30

to amend the enacted statute.  We consider "only those materials indicative of the intent of the Legislature *as a whole*."  (*Metropolitan Water Dist. v. Imperial Irrigation District* (2000) 80 Cal.App.4th 1403, 1425.)  We do not consider unsuccessful subsequent bills to be helpful in determining the Legislature's earlier intent.  (*People v. Mendoza* (2000) 23 Cal.4th 896, 922–923.)  Legislative history that is itself ambiguous does not establish the Legislature's intent.  (*Kachlon v. Markowitz* (2008) 168 Cal.App.4th 316, 337.)  Based on these principles, we conclude that the legislative history of section 1430, subdivision (b) does not show a clear intent to apply the $500 maximum on a per violation basis.

With the exception of the minority analysis for the Assembly Committee on the Judiciary, no legislative history material on Senate Bill No. 1930 (SB No. 1930), which added subdivision (b) to section 1430, suggests that the $500 maximum was to be recovered per violation.  (Compare Assem. Com. on Jud., Minority Analysis of SB No. 1930 as amended Aug. 2, 1982 (1981–1982 Reg. Sess.) p. 1 ["For each violation the patient could recover a maximum of $500 plus attorney fees at cost"] with Assem. Com. on Jud., Analysis of SB No. 1930 as amend Aug. 2, 1982 (1981–1982 Reg. Sess.), Aug. 4, 1982 p. 1 [stating that in "action for damages," licensee "would be liable for damages up to $500 and for costs and attorney fees"]; Legis. Counsel's Dig. of Assem. Amend., SB No. 1930 (1981-1982 Reg. Sess.), Aug. 12, 1982 p. 1 [stating only that licensee was made liable for up to $500].)

Respondent and the AARP amici argue the enrolled bill report prepared by the Department of Aging shows the amount recoverable under SB No. 1930 was unrestricted and could exceed the maximum for a class A violation.  The Department of Aging commented that the bill created "a more meaningful private right of action . . . by not restricting damages to the present amounts for 'A' or 'B' citations," without specifying either of these amounts or the $500 limit in SB No. 1930.  (Dept. of Aging, Enrolled Bill Rep. on SB No. 1930 prepared for Governor Brown (Aug. 25,1982) p. 1.)  In contrast, the enrolled bill report by the Department of Legal Affairs specified that the licensee "would be liable for damages up to $500 and for costs and attorney fees."  (Dept. of Legal Affairs, Enrolled Bill Rep. on SB No. 1930 prepared for Governor Brown (Aug.30, 1982)

31

p. 1 [].)  To the extent that the Department of Aging suggested recovery under SB No. 1930 could exceed the then $5,000 maximum for a class A violation, the suggestion was incorrect because the $500 limit in SB No. 1930 was significantly below that maximum.  (See *Lackner*, *supra*, 106 Cal.App.3d at p. 547.)  Enrolled bill reports "do not take precedence over more direct windows into legislative intent such as committee analyses, and cannot be used to alter the substance of legislation . . . ."  (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1218–1219, fn. 3.)  We do not find the comment by the Department of Aging to be indicative of the Legislature's intent.

Respondent and the AARP amici also rely on the Assembly Republican analysis of Assembly Bill No. 2791 (AB No. 2791) to argue that in 2004 the Legislature rejected an increase of the $500 limit to $5,000 precisely because the increase was "per violation." (See Assem. Rep. Health Com. Analysis of AB No. 2791 as amended Apr. 1, 2004 (2003–2004 Reg. Sess.) p. 1 [opposing increase from $500 to $5,000, as a 1,000 percent increase "for each violation"].)  The analysis for the Assembly Committee on Health does not include the phrase "per violation."  (See Assem. Com. on Health, Analysis of AB No. 2791 as amended Apr. 1, 2004 (2003–2004 Reg. Sess.) p. 1 [characterizing $500 as "a licensee's maximum civil liability for residents' rights violations"].)  The legislative history of the 2004 bill does not show definitively that the Legislature rejected the increase because it was "per violation."  Even if it did, a legislative declaration of an existing statute's meaning is neither binding nor conclusive in construing the statute, especially "when a gulf of decades separates the two bodies."  (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244.)

*D.  Other Considerations*

In determining the Legislature's intent, we also may consider the statute's purpose and public policy.  (*Cortez v. Abich* (2011) 51 Cal.4th 285, 292.)  Respondent and the AARP amici urge us to interpret section 1430, subdivision (b) broadly to effectuate the purpose of the Long-Term Care Act, arguing that a literal construction of the statutory language would lead to an absurd result.  "Where more than one statutory construction is arguably possible," we must "'favor the construction that leads to the more reasonable

result.' [Citation.] . . . Thus, our task is to select the construction that comports most closely with the [drafters'] apparent intent, with a view to promoting rather than defeating the statute['s] general purpose, and to avoid a construction that would lead to unreasonable, impractical, or arbitrary results. [Citations.]" (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 388.)

The Act is designed to ensure "that long-term health care facilities provide the highest level of care possible." (Health & Saf. Code, § 1422, subd. (a).) Its focus is preventative; its purpose—to encourage regulatory compliance and prevent injury from occurring. (*Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 148, 150.) But to the extent respondent and the AARP amici proceed on the assumption that section 1430, subdivision (b) aims solely or largely to protect the health and safety of nursing home residents, they are incorrect since, as we explained, some patient's rights violations are not related to health and safety. In fact, the legislative history of SB No. 1930 indicates the bill was intended largely as a mechanism for enforcement of those patient's rights the Attorney General could not enforce because they were not directly related to health and safety. (Assem. Com. on Jud., Analysis of SB No. 1930 as amend Aug. 2, 1982 (1981–1982 Reg. Sess.), Aug. 4, 1982 p. 1.)

The Long-Term Care Act provides an abundance of reasons for licensees not to transgress its health and safety objectives, and the additional private remedy in section 1430, subdivision (b) is not limited to the maximum $500 monetary relief. The licensee also is faced with the prospect of paying the other side's attorney fees and costs and suffering an injunction with its attendant fine for contempt of court. Thus, the argument that the $500 statutory maximum must be applied on a "per violation" basis in order to make private enforcement feasible does not withstand scrutiny. In the case of a single violation, the "per violation" approach would make no difference since the patient would recover only $500. On the other hand, cases of repeated or wide-spread violations would normally qualify for injunctive relief, the classic remedy to prevent future violations, with monetary and coercive sanctions for contempt. (See *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 332–333 [injunction proper where "reasonable certainty that the

wrongful acts will be continued or repeated"; Code Civ. Proc., § 1218, subd. (a) [providing for fine of up to $1,000 for contempt of court in civil action].) Such cases may generate substantial attorney fee awards irrespective of the amount the patient actually recovers since that amount would be only one factor is determining the reasonableness of the attorney fee award.

The "per violation" approach, as applied in a private action under section 1430, subdivision (b), presents its own problems since that subdivision provides no standard for determining a licensee's liability in the case of continuing violations, such as the understaffing and failure to offer restraints here. The suggestion that section 1430, subdivision (b) should be "liberally construed" to allow an unlimited monetary recovery because it is not tied to the administrative enforcement scheme raises due process concerns. In *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 534, overruled on other grounds in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, the court explained that imposing a monetary sanction on a nursing home under the Business and Professions Code section 17536 for each day or each failure that constituted evidence of a business practice in violation of a regulation "would result in an unreasonable or oppressive statutory penalty."

Respondent and the AARP amici's reliance on *Gallamore v. Workers' Comp. Appeals Bd.* (1979) 23 Cal.3d 815, 823 and *Davison v. Industrial Acc. Com.* (1966) 241 Cal.App.2d 15, 18 is misplaced. These cases authorized successive penalties for unreasonable delays in payment of worker's compensation benefits, but only after notice. The administrative enforcement provisions of the Long-Term Care Act provide for notice. Under Health and Safety Code section 1425, a penalty of $50 "for each day" is assessed when a violation continues beyond the date specified for its correction in an administrative citation. Additionally, section 1424, subdivision (d) recognizes that "one or more practices, means, methods, or operations" may constitute a violation. Section 1430, subdivision (b) provides no notice as to what evidentiary facts constitute a single

34

continuing violation or separate violations of a patient's right, or whether a practice or a course of conduct gives rise to one or more violations.

Appellants invite us to conclude that, under the primary rights theory, a single statutory cause of action arises regardless of the number of violations of the Patient's Bill of Rights. They rely exclusively on *Miller v. Collectors Universe, Inc.* (2008) 159 Cal.App.4th 988 (*Miller*). That case construed Civil Code section 3344, which provides for liability in the case of a wrongful name appropriation of the greater of $750 or the actual damages suffered "as a result of the unauthorized use." (*Id.* at p. 1000.) The defendant had wrongfully used the plaintiff's name on over 14,000 certificates of authenticity of various collectibles, and the plaintiff argued he was entitled to statutory damages exceeding $10 million. (*Id.* at p. 991.) The court held the plaintiff had a single cause of action for wrongful appropriation of his name and was entitled to a single award of $750. (*Ibid.*)

Under the primary right theory, "'"a cause of action consists of 1) a primary right possessed by the plaintiff, 2) a corresponding primary duty devolving upon the defendant, and 3) a delict or wrong done by the defendant which consists in a breach of such primary right and duty. [Citation.] Thus, *two actions constitute a single cause of action if they both affect the same primary right*."' [Citation.]" (*Miller*, *supra*, 159 Cal.App.4th at p. 1004.) The primary right theory is used to determine whether more than one cause of action may arise from the same facts. (*Id.* at p. 1005.) In *Miller*, the primary right was the right to be free from "mental anguish resulting from commercial misappropriation." (*Id.* at p. 1006.) The court concluded this primary right was violated only once since the certificates were "issued for a common purpose pursuant to a common plan: to use Miller's name as a member of the panel of authentication experts." (*Id.* at p. 1008.)

In Civil Code section 3344, which *Miller*, *supra*, 159 Cal.App.4th 988 construed, the statutory damage award was tied to "the unauthorized use." No such language appears in section 1430, subdivision (b). Thus, *Miller* is not authority for the proposition that section 1430, subdivision (b) creates a single statutory cause of action for all violations of the Patient's Bill of Rights. Appellants provide no other authority, nor do

they explain how this proposition squares with the subdivision's additional coverage of "any other right" under federal or state law. They failed to distinguish the right to bring a civil action, which is what section 1430, subdivision (b) creates, from a cause of action. (See *Lu v. Hawaiian Gardens Casino, Inc.* (2010) 50 Cal.4th 592, 597, fn. 3 ["'"action" refers to the judicial remedy to enforce an obligation,"' whereas "'"cause of action" refers to the obligation itself"'].)

Appellants also fail to identify the common primary right that may be at issue in all cases brought under section 1430, subdivision (b). A private suit under that subdivision has been compared to "a private suit for the violation of civil rights under the federal Civil Rights Act of 1871 (42 U.S.C. § 1983 [section 1983])." (*California Assn. of Health Facilities v. Department of Health Services*, *supra*, 16 Cal.4th at p. 295.) Neither statute is a source of substantive rights, as each provides only a method of enforcing rights "elsewhere conferred." (See *McAllister v. Los Angeles Unified School Dist.* (2013) 216 Cal.App.4th 1198, 1207.) In addition, section 1430, subdivision (b) does not require proof of a particular injury and imposes liability solely upon the showing a violation of a statute or regulation that comes within its scope. Certainly, not all violations will be based on the same facts. For all these reasons, we find unpersuasive appellants' argument that patients are limited to a single cause of action under section 1430, subdivision (b).

We conclude that the $500 maximum in section 1430, subdivision (b) applies per civil action rather than per violation. Respondent is entitled to only one such award in this case.

## DISPOSITION

The judgment is affirmed solely as to the jury's verdict on the Patient's Bill of Rights.  In all other respects the judgment is reversed.  The case is remanded to the trial court for further proceedings consistent with this opinion.

Appellants are entitled to their costs on appeal.

**CERTIFIED FOR PUBLICATION**


EPSTEIN, P. J.

We concur:


WILLHITE, J.


SUZUKAWA, J.