Filed 1/30/15  Ibanez v. Magic Mountain, LLC CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CARLOS IBANEZ, | B248863 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. PC045095) |
| v. | |
| MAGIC MOUNTAIN, LLC, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Melvin D. Sandvig, Judge.  Affirmed.

Law Office of Martin L. Stanley, Martin L. Stanley, Jeffrey R. Lamb; Law Office of Shea Murphy, Shea S. Murphy; Esner, Chang & Boyer and Stuart B. Esner for Plaintiff and Appellant.

Prindle, Amaro, Goetz, Hillyard, Barnes & Reihnoltz, Michael L. Amaro and Sanaz Cherazaie for Defendant and Respondent, Magic Mountain, LLC.

Appellant Carlos Ibanez suffered traumatic brain injury, among other injuries, at the Six Flags Magic Mountain amusement park (Magic Mountain) on August 30, 2008, when he was hit by a roller coaster (called the "Ninja") as he was walking in the area in which the Ninja was operating. Ibanez, through his guardian ad litem, filed a lawsuit against Six Flags Theme Parks, Inc., Six Flags Operations, Inc., and Magic Mountain, LLC,[1] alleging claims for negligence, premises liability, strict liability, common carrier liability, and negligence per se. The case was tried twice. In the first trial, jury deadlocked and the trial court declared a mistrial. In the second trial, the jury returned a verdict in favor of Magic Mountain, finding it not negligent. On appeal from the judgment, appellant challenges several evidentiary rulings of the trial court. Although we conclude that the trial court erred in certain evidentiary rulings, the errors were not prejudicial, and therefore we affirm the judgment.

## BACKGROUND

*Factual Background*[2]

    I.    *The Accident*

On August 30, 2008, appellant visited Magic Mountain with some friends and family members. He was wearing a Los Angeles Dodgers cap he had received as a gift from an uncle who died shortly after giving it to appellant.

Appellant rode several roller coasters, including one called the "Jet Stream." His cap blew off while riding the Jet Stream. After getting off the ride, appellant

---

[1]     Magic Mountain, LLC, referred to as Magic Mountain, is the remaining defendant and respondent.

[2]     We set forth only the evidence pertinent to the issues raised on appeal.

spoke to a park employee about his hat and was told that he needed to wait until the park closed before anyone could look for it. Appellant knew that he could not stay until the park closed because his group of friends included children who needed to leave early.

William Thurman, director of operations for Magic Mountain, testified that the park's policy about lost items was to retrieve the items at the end of the day, unless the item was medication. The park generally did not shut down rides and retrieve lost items during the day because the process of shutting down the ride and reopening it took 30 to 45 minutes.

Appellant and his then brother-in-law, Ramon Ortiz, went to look for the hat, which appellant thought was in an area behind a wooden fence. They peered through the slats of the fence but did not see the hat. A sign on the fence stated, "Authorized Personnel Only," which appellant understood to mean there would be someone behind the fence who could help him retrieve the hat.[3] Appellant noticed a gap in the fence, which was created by a column supporting the Ninja roller coaster track. The column had a concrete base that was approximately 36 inches high, but wider in diameter than the column itself, causing the gap between the column and the wooden fence.

After searching unsuccessfully for approximately 15 minutes, appellant and Ortiz went to eat lunch with members of their group. During lunch, appellant told his friends about his hat, but they told him to forget about it and not to look for it. Because of the emotional significance of the hat to him, appellant left the group

[3]     Magic Mountain asserts in its brief that appellant testified in his deposition that he believed this sign meant that only employees were allowed to enter the restricted area. However, the citation Magic Mountain provides does not support this assertion and in fact is to its own expert's testimony, not to appellant's testimony. Appellant testified at trial.

and went to the park's guest relations office to speak to someone about the hat. An employee told him that someone would retrieve the hat and mail it to him, but appellant did not want to wait. Appellant returned to the Jet Stream ride, where the attendant again told him he needed to wait until the park closed because it was too dangerous to try to retrieve it.

Appellant returned to the gap in the wooden fence he had seen previously, stepped on the concrete base, and slipped into the area behind the fence. Appellant hoped to find a park employee to help him find his hat.

Inside the area bounded by the wooden fence there was a four-and-a-half foot high chain link fence around the perimeter of the Ninja roller coaster track. There were no warning signs to keep people out of the area enclosed by the chain link fence. Appellant walked along the inside of the wooden fence and saw a green box, approximately 3 feet tall and located 18 inches from the chain link fence. Appellant stepped on the box and climbed over the chain link fence.

The Ninja roller coaster went by on its track while appellant was behind the chain link fence. Appellant realized it was dangerous, but he thought the track was high enough for the roller coaster not to hit him. Appellant already had ridden the Ninja several times that day and knew that the Ninja is a suspended roller coaster that hangs below its track. Appellant was struck in the head by the roller coaster.

II.    *The Fences*

Magic Mountain employees testified that the wooden fence was a cosmetic fence installed in 2006 to prevent guests from seeing an unsightly area.[4] The four-

---

[4]    Thurman acknowledged, however, that there was no documentation describing the fence as "cosmetic," and, in fact, prior to this case, no one at Magic Mountain had ever described the fence in those terms. At his deposition prior to the first trial, Thurman acknowledged that he did not know the purpose of the wooden fence.

and-a-half foot high chain link fence around the perimeter of the Ninja roller coaster track, called the perimeter fence, was installed when the Ninja was built in 1988. The area within the perimeter fence is referred to as the "red lock area" because access gates into the area are locked with red locks.

### A. *Testimony of State Inspector*

Magic Mountain called as a witness Bryan Eckman, a safety engineer with the state of California Department of Industrial Relations Division of Occupational Safety and Health (DOSH) amusement ride unit, who was responsible for inspecting amusement park rides in Southern California at the time of the accident. Eckman testified that he had been working as a "qualified safety inspector" for DOSH for 12 years, and that DOSH relied on standards known as ASTM standards in conducting safety inspections.[5]

Eckman testified that ASTM F1159-02 was adopted by the state in 2002 and addressed the minimum height requirement for fencing around amusement park rides.[6] According to Eckman, at the time of the accident in August 2008, the

---

[5] "ASTM" stands for "American Society for Testing Materials." (See Cal. Code Regs., tit. 8, § 453.) ASTM standards govern permanent amusement park rides in California pursuant to regulations promulgated by DOSH. (See *id.*, § 3195.1; Lab. Code, § 7923.)

[6] ASTM F1159-02 "establishes information and procedures for the design and manufacture of amusement rides and devices." It emphasized that *"This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use."* (Italics in original.) Section 14 of ASTM F1159-02 set forth standards for fencing for amusement rides manufactured after January 1, 1993. It provided in pertinent part that "When fences and gates are designed and manufactured to provide protection to

regulation required a fence to be "at least 42 inches above the surface upon which the spectators or riders stand."[7]

Eckman further testified that DOSH had inspected every ride at Magic Mountain three times a year from 2002 until the accident in 2008. Eckman had trained his staff to measure the ride perimeter fencing to ensure it complied with ASTM F1159-02 and all the rules and regulations of DOSH. He explained that if the fence height for the Ninja had been deficient, that would have been indicated in DOSH's report, along with an order to abate the problem, and DOSH would not have allowed Magic Mountain to operate the ride if it presented an imminent hazard. Eckman had examined DOSH's file for the Ninja and did not find any documentation of deficiency in the perimeter fencing around the Ninja. He concluded that, if the chain link fence was 42 inches tall, it complied with state rules and regulations.

Eckman inspected the Ninja ride following appellant's accident. He noticed the gap in the wooden fence created by the pillar, but he measured the chain link fence and found that it exceeded the 42-inch minimum height required by the state. DOSH did not require Magic Mountain to increase the height of the chain link fence. Eckman did not recall seeing the box on which appellant stood to climb over the fence. Over appellant's objection, Eckman testified that, based on the picture of the box near the fence, he did not believe the box presented an imminent

spectators and riders, they shall be . . . a height of at least 42 in. above the surface on which the spectators or riders stand."

[7]     Appellant repeatedly objected to Eckman's testimony on various grounds, including that Eckman had not been designated an expert witness and that his testimony violated the Labor Code, but the court overruled the objections.

6

hazard.  He further testified that DOSH did not require Magic Mountain to change any signage after the accident.

B.      *Testimony of Magic Mountain's Expert*

Magic Mountain's expert, Carl Freeman, testified that he worked for the company that designed the Ninja and was involved in the engineering of the ride and the perimeter fencing when the roller coaster was first installed.  Freeman was a member of the ASTM committee that writes the standards regulating amusement parks.  He testified that ASTM F1159-02 adopted the 42-inch fencing standard from building codes that were designed to prevent falls from balconies or stairways.  Freeman inspected the chain link fence surrounding the Ninja before the ride opened to the public and determined that it satisfied the 42-inch minimum height requirement.

At the time of trial, Freeman worked for an amusement park called Lagoon Park in Utah.  He testified that in the past, guests at Lagoon Park had been injured by roller coasters "because they defeated safety barricades around hazardous zones."  He explained that some areas behind fences are inviting to guests who have lost items such as jewelry, caps, or cell phones, because there appears to be sufficient room between the track and the ground to be safe.  Lagoon Park uses 9-foot tall fences around those roller coasters.  Freeman described a ride called the Bat, which has a 7-foot tall fence because guests are able to see inside the perimeter fencing and might be tempted to enter to retrieve items.  Over appellant's objection, Freeman continued to testify about perimeter fencing at

7

Lagoon Park's other roller coasters.[8] He stated that rides called the Colossus, Wild Mouse, and the Puff had perimeter fences of 5 feet 3 inches, 44 inches, and 48 inches respectively. The Ninja's fence varied between four-and-a-half feet and five feet high, exceeding the minimum height standard.

### C. *Testimony of Magic Mountain Employees*

Thomas Edgar, Magic Mountain's safety manager, testified that ASTM F1159-02 was the industry standard for amusement park rides. According to Edgar, the 42-inch height requirement for ride perimeter fences had been the standard since 1997, and the Ninja's fence exceeded that requirement. He stated that, in addition to inspections by DOSH and Magic Mountain's internal inspections by its own maintenance team, Magic Mountain hired a third party, the Lundy Group, to conduct inspections of the rides. In 2007 and 2008, the Lundy Group inspected every ride, including the fences. The Lundy Group did not recommend making any changes to either the wooden fence or the chain link fence surrounding the Ninja.

Edgar further testified that he met regularly with state inspectors. State inspectors inspected the rides' fences three times a year from 2003 through 2008 and never required Magic Mountain to increase the height of the chain link fence or make any other changes. State safety inspectors, including Eckman, investigated the Ninja after appellant's accident and did not require Magic Mountain to make any changes to its fencing

---

[8]     Appellant repeatedly objected that the court previously had excluded his evidence about fencing at other Magic Mountain roller coasters and so should exclude evidence about roller coasters' fences at Lagoon Park, but the court overruled his objections.

Tim Burkhart, the vice president of maintenance and construction for Magic Mountain, testified that the four-and-a-half-foot chain link fence around the Ninja was erected in 1988 when the ride was built. The wooden fence was erected in 2006 and was never intended as a perimeter to keep guests out of the restricted area. Burkhart testified that he had never heard of any park guests entering the area behind the chain link fence.

Burkhart testified that the state required the fence to be 42 inches high. After the accident, Burkhart took Eckman to the fence and showed him that the fence exceeded the 42-inch height requirement. Burkhart testified that Eckman did not require Magic Mountain to increase the height of the chain link fence or make any other changes before the Ninja was reopened.

*Procedural Background*

Appellant alleged causes of action for negligence, premises liability, strict liability, common carrier liability, and negligence per se.

Before the second trial, both sides renewed several motions in limine which they had made at the first trial The court adopted the same rulings it had made at the first trial. As relevant to this appeal, we discuss those evidentiary rulings below.

The jury in the second trial returned a verdict in favor of Magic Mountain, finding it not negligent in the first question of the special verdict form. The court entered judgment in favor of Magic Mountain. The court denied appellant's motion for new trial. Appellant timely appealed.

9

**DISCUSSION**

Appellant contends that the trial court prejudicially erred in several evidentiary rulings. "We review a trial court's ruling on the admissibility of evidence for abuse of discretion. [Citation.] The error is reversible if it resulted in a miscarriage of justice. [Citation.]" (*Nevarrez v. San Marino Skilled Nursing & Wellness Centre, LLC* (2013) 221 Cal.App.4th 102, 117 (*Nevarrez*).) "'While trial judges ordinarily enjoy broad discretion with respect to the admission and exclusion of evidence in ruling on motions in limine [citation], a court's discretion is limited by the legal principles applicable to the case.' [Citation.] 'Thus, if the trial court's in limine ruling was based upon a misinterpretation of applicable law, an abuse of discretion has been shown.' [Citation.]" (*McIntyre v. The Colonies-Pacific, LLC* (2014) 228 Cal.App.4th 664, 670.)

I.    *DOSH Inspector Bryan Eckman*

Appellant objected to the testimony of DOSH inspector Bryan Eckman, and to evidence that DOSH had never cited Magic Mountain, on the ground the evidence was barred by Labor Code section 6304.5 (section 6304.5). The trial court overruled the objection. On appeal, appellant renews his argument that section 6304.5 precluded this evidence. We agree.

Section 6304.5 provides in pertinent part: "Neither the issuance of, or failure to issue, a citation by the division [DOSH] shall have any application to, nor be considered in, nor be admissible into, evidence in any personal injury or wrongful death action, except as between an employee and his or her own employer. Sections 452 and 669 of the Evidence Code shall apply to this division and to occupational safety and health standards adopted under this division in the same manner as any other statute, ordinance, or regulation. The testimony of

10

employees of the division shall not be admissible as expert opinion or with respect to the application of occupational safety and health standards."[9]

Based on the plain language of the statute, neither Eckman (nor any other witness) was entitled to give testimony concerning any "failure to issue a citation" by DOSH. (See *Elsner v. Uveges* (2004) 34 Cal.4th 915, 935 [section 6304.5 "prevents nonemployer defendants from showing that no citation was issued"] (*Elsner*).) Moreover, Eckman, as a DOSH employee, was not entitled to testify as an expert or "with respect to the application of" DOSH standards.[10] (§ 6304.5.) Given these prohibitions, none of Eckman's testimony was admissible.

---

[9] Section 6304.5 provides in full: "It is the intent of the Legislature that the provisions of this division, and the occupational safety and health standards and orders promulgated under this code, are applicable to proceedings against employers for the exclusive purpose of maintaining and enforcing employee safety.

"Neither the issuance of, or failure to issue, a citation by the division shall have any application to, nor be considered in, nor be admissible into, evidence in any personal injury or wrongful death action, except as between an employee and his or her own employer. Sections 452 and 669 of the Evidence Code shall apply to this division and to occupational safety and health standards adopted under this division in the same manner as any other statute, ordinance, or regulation. The testimony of employees of the division shall not be admissible as expert opinion or with respect to the application of occupational safety and health standards. It is the intent of the Legislature that the amendments to this section enacted in the 1999-2000 Regular Session shall not abrogate the holding in Brock v. State of California (1978) 81 Cal.App.3d 752."

[10] Without citation to authority, counsel for Magic Mountain asserted at oral argument that Eckman was an employee of a different unit from that at issue in section 6304.5. This assertion is belied by the record and the Labor Code. Eckman testified, "I work for the State of California Department of Industrial Relations Division of Occupational Safety and Health amusement ride unit." Section 7902 of the Labor Code provides: "The division shall promulgate and formulate rules and regulations for adoption by the Occupational Safety and Health Standards Board for the safe installation, repair, maintenance, use, operation, and inspection of all amusement rides as the division finds necessary for the protection of the general public using amusement rides." Section 6302 defines the terms used in this portion of the Labor Code and provides that

First, although not designated as an expert witness, Eckman improperly testified as one. He described his expert credentials – "qualified safety inspector" for DOSH for 12 years. He explained the 42-inch minimum height requirement of ASTM F1159-02 for fencing around amusement park rides, stated that the requirement applied in August 2008 when plaintiff's accident occurred, and opined that if the chain link fence around the Ninja was 42 inches tall, it complied with state rules and regulations. Shown a photograph of the box on which plaintiff stepped to climb over the chain link fence at the Ninja, Eckman testified that he did not believe the box presented an imminent hazard. These opinions – the applicability of ATSM F1159-02, compliance with that provision, and the nonhazardous nature of the box – were matters "beyond common experience" (Evid. Code, § 801, subd. (a)), and were based not simply on Eckman's personal observations, but on his "special knowledge, skill, experience, training, and education." (*Id.,* subd. (b)). They constituted expert, not lay, opinion evidence, and were inadmissible under section 6304.5. (*See People v. Fiore* (2014) 227 Cal.App.4th 1362, 1384 ["Unlike an expert opinion, a lay opinion must involve a subject that is '"of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness."' [Citation.]"].)

Second, Eckman improperly testified concerning the "failure to issue . . . a citation" by DOSH to Magic Mountain, and improperly testified "with respect to the application of occupational safety and health standards" to Magic Mountain. (§ 6304.5.) Eckman stated that DOSH inspected every ride at Magic Mountain three times a year from 2002 until the accident in 2008, and he had trained his staff to measure the ride perimeter fencing to ensure it complied with ASTM F1159-02

"Department" means the Department of Industrial Relations, and "Division" means the Division of Occupational Safety and Health. (§ 6302, subds. (b) & (d).)

12

and all the rules and regulations of DOSH. He explained that if the fence height for the Ninja had been deficient, that fact would have been indicated in DOSH's report, along with an order to abate the problem, and DOSH would not have allowed Magic Mountain to operate the ride if it presented an imminent hazard. He testified that he had examined DOSH's file for the Ninja and did not find documentation of any deficiency in the perimeter fencing around the Ninja. He also testified that DOSH did not require Magic Mountain to increase the height of the chain link fence.

Although the word "citation" was never used, this testimony implicitly amounted to testimony that DOSH did not issue any citations to Magic Mountain regarding its fencing. DOSH is required to issue a citation if, after inspection or investigation, it "believes that an employer has violated . . . any standard, rule, order, or regulation established pursuant to Chapter 6 (commencing with Section 140) of Division 1 of the Labor Code, or any standard, rule, order, or regulation established pursuant to this part." (§ 6317; see § 6302, subd. (d) [defining "Division" as the Division of Occupational Safety and Health].) Obviously, testimony that DOSH would not have allowed Magic Mountain to operate the ride if it presented an imminent hazard, that DOSH's file for the Ninja noted no deficiency in its fencing, and that DOSH did not require Magic Mountain to increase the height of the chain link fence, was tantamount to testimony that no citation was issued. Further, that testimony necessarily constituted testimony concerning the application of DOSH standards. Therefore, it was inadmissible under section 6304.5

In short, Eckman's testimony should have been excluded in its entirety.

II.    *Testimony of Thomas Edgar and Tim Burkhart*

Magic Mountain's safety manager Thomas Edgar testified that in DOSH inspections from 2003 through 2008, and in the inspection after plaintiff's accident by Eckman, DOSH inspectors did not require Magic Mountain to change the height of the chain link fence around the Ninja. Similarly, Magic Mountain employee Tim Burkhart testified that after the inspection concerning plaintiff's accident, Eckman did not require any change to the fencing.

Like Eckman's testimony, this testimony by Edgar and Burkhart constituted testimony that DOSH issued no citation to Magic Mountain, and violated the prohibition of section 6304.5 against such evidence. Section 6304.5 "is evenhanded, as it prevents nonemployer defendants from showing that no citation was issued but also prevents nonemployee plaintiffs from showing that a citation was issued. A legislative judgment was made that in third party cases such evidence, on either side, ought not to play a role in the jury's deliberations." (*Elsner, supra,* 34 Cal.4th at p. 935.)

III.    *Admission of ASTM F1159-02 Regarding the Standard of Care*

Appellant contends that section 6304.5 precluded the admission of any evidence that the minimum height requirement of ASTM F1159-02 was relevant to the standard of care. We already have determined that Eckhart's testimony concerning compliance with the height requirement was inadmissible because he was a DOSH employee. But we disagree that section 6304.5 also precluded other evidence on the point – in particular, testimony by Edgar (Magic Mountain's safety manager) and Carl Freeman, Magic Mountain's designated expert. We conclude that although the holding of *Elsner, supra,* is not dispositive, its interpretation of section 6304.5 leaves no doubt that Magic Mountain was entitled to introduce the

14

testimony of Edgar and Freeman as evidence showing that it complied with ASTM F1159-02.

Edgar, Magic Mountain's safety manager, testified that ASTM F1159-02 was the industry standard for amusement park rides, that the 42-inch height requirement for ride perimeter fences had been the standard since 1997, and that the Ninja's fence exceeded that requirement. Freeman testified that he worked for the company that designed the Ninja and was involved in the engineering of the ride and the perimeter fencing when the roller coaster was first installed. He also was a member of the ASTM committee that writes the standards regulating amusement parks. He testified that ASTM F1159-02 adopted the 42-inch fencing standard from building codes that were designed to prevent falls from balconies or stairways. He inspected the chain link fence surrounding the Ninja before the ride opened to the public and determined that it satisfied the 42-inch minimum height requirement.

As we explain, this testimony did not violate section 6304.5 as that provision is construed in *Elsner*. The current version of section 6304.5 (the version applicable in the instant case) was adopted by 1999 amendments. In *Elsner,* the Supreme Court construed these amendments in a case in which a roofer was injured when a scaffold collapsed and sued the general contractor on the project, who had hired the roofer's employer. Applying the 1999 amendments to section 6304.5 retroactively (the roofer was injured in 1998), the trial court overruled the contractor's objection that section 6304.5 precluded evidence that the scaffold violated Cal-OSHA regulations. Although the Supreme Court concluded that the trial court erred in applying the amendments retroactively, the court nonetheless considered the question "to what extent . . . the 1999 amendments repealed the ban on the admission of Cal-OSHA provisions in third party negligence actions."

15

(*Elsner, supra,* 34 Cal.4th at p. 924.)  The court "conclude[d] that the amendments restore the common law rule and allow use of Cal-OSHA provisions to establish standards and duties of care in negligence actions against private third parties."  (*Id.* at p. 924.)

As *Elsne*r explained, until the 1999 amendments, section 6304.5 (enacted in 1971) provided in relevant part that "'Neither this division nor any part of this division shall have any application to, nor be considered in, nor be admissible into, evidence in any personal injury or wrongful death action arising after the operative date of this section,  except as between an employee and his own employer.'  (Stats. 1971, ch. 1751, § 3, p. 3780.)  Thereafter, both [the Supreme Court] and the Courts of Appeal consistently held that section 6304.5 barred the introduction of Cal-OSHA provisions in actions between employees and third party tortfeasors. [Citations.]" (*Elsner, supra,* 34 Cal.4th at p. 926.)

In 1999, the Legislature amended section 6304.5 to its current version.  In doing so, it eliminated the language prohibiting consideration of Cal-OSHA regulations in third party negligence actions.  (*Elsner, supra,* 34 Cal.4th at p. 929 [1999 amendment "deleted . . . language that had imposed a ban in clear and unmistakable terms" on admission of Cal-OSHA provisions in third party cases].)  In place of the ban, the 1999 amendments added the language we have previously referred to:  "Neither the issuance of, or failure to issue, a citation by the division shall have any application to, nor be considered in, nor be admissible into, evidence in any personal injury or wrongful death action, except as between an employee and his or her own employer.  *Sections 452 and 669 of the Evidence Code shall apply to this division and to occupational safety and health standards adopted under this division in the same manner as any other statute, ordinance, or regulation.*"  (§ 6304.5, italics added.)

16

Interpreting the italicized language, *Elsner* observed: "Evidence Code section 452 allows judicial notice of state statutes and regulations. [Citation.] Evidence Code section 669 allows proof of a statutory violation to create a presumption of negligence in specified circumstances. It codifies the common law doctrine of negligence per se, pursuant to which statutes and regulations may be used to establish duties and standards of care in negligence actions. While adding this language, the amendments to Labor Code section 6304.5 also deleted language precluding admission of Cal-OSHA provisions in third party actions . . . . [¶] In combination, the new language and the deletion indicate that henceforth, Cal-OSHA provisions are to be treated like any other statute or regulation and may be admitted to establish a standard or duty of care in all negligence and wrongful death actions, including third party actions." (*Elsner*, *supra*, 34 Cal.4th at pp. 927-928, fns. omitted.)

As here relevant, the court's specific holding was that "[i]n general, plaintiffs may use Cal-OSHA provisions to show a duty or standard of care to the same extent as any other regulation or statute, whether the defendant is their employer or a third party."[11] (*Elsner*, *supra*, 34 Cal.4th at pp. 935-936.) Of course, in the instant case the issue is a different one: not whether a plaintiff may use Cal-OSHA regulations to show negligence per se, but rather whether a defendant can use compliance with those regulations to show that it met the applicable standard of care. But as *Elsner* recognized, the 1999 amendments repealed the categorical ban on consideration of Cal-OSHA regulations in third

---

[11]    The court interpreted another provision of the 1999 amendments not relevant to this case to exclude Cal-OSHA provisions "when the state is the defendant based on actions it took or failed to take in its regulatory capacity; in such cases, Cal-OSHA provisions remain inadmissible to show liability based on breach of the statutory duty to inspect worksites and enforce safety rules." (*Elsner*, *supra*, 34 Cal.4th at p. 936.)

party negligence cases. Further, while the specific holding of *Elsner* is that a plaintiff may use Cal-OSHA standards to prove negligence, nothing in *Elsner* suggests that section 6304.5 precludes a defendant from introducing evidence of compliance with such standards. To the contrary, *Elsner* states that the 1999 "amendments restore the common law rule and allow use of Cal-OSHA provisions to establish standards and duties of care in negligence actions against private third parties." (*Id.* at p. 924.)

The common law rule allows a defendant to introduce evidence that it is in compliance with a relevant statutory duty of care. In general, courts do not "look[] favorably on the use of statutory compliance as a defense to tort liability. [Citation.] That is because a statute, ordinance or regulation ordinarily defines a minimum standard of conduct. [Citation.] A minimum standard of conduct does not preclude a finding that a reasonable person would have taken additional precautions under the circumstances. [Citation.] Nevertheless, where the evidence shows no unusual circumstances statutory compliance may be accepted by the trier of fact, or by the court as a matter of law, as sufficient. [Citation.]" (*Myrick v. Mastagni* (2010) 185 Cal.App.4th 1082, 1087; see also *Nevarrez*, *supra*, 221 Cal.App.4th at p. 115 ["'[L]ike statutes, applicable regulations are a "factor to be considered by the jury in determining the reasonableness of the conduct in question."' [Citation.]"]; *Amos v. Alpha Property Management* (1999) 73 Cal.App.4th 895, 901 [the defendants' compliance with applicable fire, building and safety codes was relevant to show due care, although it did not necessarily negate breach of duty].)

As to premises liability in particular, "'a defendant property owner's compliance with a law or safety regulation, in and of itself, does not establish that the owner has utilized due care. The owner's compliance with applicable safety

18

regulations, while relevant to show due care, is not dispositive, if there are other circumstances requiring a higher degree of care.' [Citation.]" (*Lawrence v. La Jolla Beach & Tennis Club, Inc.* (2014) 231 Cal.App.4th 11, 31 (*Lawrence*); see also *Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 432-433 ["Although evidence that the condition of the property is in compliance with 'industry' standards is relevant, that is not the only inquiry necessary for applying California premises liability standards."] (*Howard*).) Thus, under common law principles, evidence that Magic Mountain complied with DOSH standards was relevant, though not dispositive, in determining whether Magic Mountain exercised due care.

Appellant contends that the legislative history of section 6304.5 indicates that Cal-OSHA regulations are admissible only to establish the standard of care by a plaintiff in pursuing a negligence per se claim. *Elsner* observed that the 1999 amendments to section 6304.5 were part of "an omnibus measure intended to increase civil and criminal sanctions against those who maintain unsafe working conditions. . . . The net effect of the proposed reforms was to increase significantly the sanctions available against those in control of workplace safety, with the goal of deterring unsafe practices and reducing the number and severity of future accidents. This overall purpose is consistent with our reading of the plain language of the amendments as allowing Cal-OSHA provisions in third party suits and thereby facilitating private suits against workplace tortfeasors. [Citation.]" (*Elsner*, *supra*, 34 Cal.4th at pp. 929-930.) Given the overall purpose of the omnibus bill of which the amendments to 6304.5 were a part, we disagree that allowing a defendant to introduce compliance with Cal-OSHA is inconsistent with the legislative intent. Permitting defendants to introduce compliance with Cal-OSHA regulations in defense of workplace lawsuits constitutes an incentive to

comply with applicable safety regulations. This is consistent "with the goal of deterring unsafe practices and reducing the number and severity of future accidents." (*Elsner, supra,* 34 Cal.4th at p. 930.)

Moreover, "'[u]nder the standard rules of statutory construction, we will not read into the statute a limitation that is not there. [Citation.]' [Citations.]" (*Suarez v. Pacific Northstar Mechanical, Inc.* (2009) 180 Cal.App.4th 430, 443.) The Legislature eliminated the absolute ban on use of Cal-OSHA regulations in third party actions, and added no language prohibiting a defendant from introducing evidence that it is in compliance with such regulations. Thus, we presume that common law negligence principles regarding the admission of safety regulations apply. As a result in the instant case, Magic Mountain was permitted to introduce evidence that it was in compliance with the fence height regulation of ASTM F1159-02. Although, as we have held, Eckman should not have been permitted to testify on the point, section 6304.5 did not preclude Edgar and Freeman's testimony that the perimeter fencing of the Ninja complied with ASTMF 1159-02.

Noting that the Ninja was built in 1988, appellant contends that the admission of ASTM F1159-02 was erroneous because that regulation was adopted in 2002 and the heading of its fencing requirement states: "Fencing for Amusement Rides and Devices Manufactured After January 1, 1993." However, on this record, there was no dispute that the 42-inch minimum requirement contained in the regulation was the applicable minimum industry standard. According to Edgar's testimony, the 42-inch minimum height requirement by ASTM had been the standard for such fences since at least 1997. Moreover, Freeman testified that when he approved the installation of the Ninja's fence (which occurred in 1988), the 42-inch minimum requirement applied. Significantly, appellant did not present any evidence that this was not the minimum

20

height standard applicable to the perimeter fencing around Ninja. A defendant's compliance with industry standards is relevant to show that the defendant met the applicable standard of care. (See *Lawrence*, *supra*, 231 Cal.App.4th at p. 31; *Nevarrez*, *supra*, 221 Cal.App.4th at p. 115.) As such, evidence that the fencing around the Ninja complied with the 42-inch requirement, which was adopted in ASTM F1159-02, was relevant as a factor to consider in determining whether Magic Mountain was negligent.

IV. *Deposition Testimony of Marilyn Hernandez*

Appellant contends that the trial court erred in excluding the deposition testimony of Marilyn Hernandez.[12] He is mistaken.

At the time of the second trial, Hernandez was in the Navy. In her deposition, Hernandez testified that after appellant's accident, Frank Grey, an employee of Magic Mountain, showed her the gap in the wooden fence created by the column supporting the Ninja track. Hernandez asked Grey if appellant could have gone through that gap, and Grey told her that Magic Mountain previously had ejected guests from the park for going through the gap.

In the first trial, Grey testified as a witness, and denied telling Hernandez this. However, Grey was not called as a witness in the second trial.

Oddly, appellant contends that Hernandez's testimony was admissible as impeachment evidence of Grey in the second trial, even though Grey did not testify. He cites no applicable authority, and there is none.

---

[12] Appellant also argues that the trial court erroneously excluded testimony of appellant's sister, Lizette Sanchez. Although appellant repeatedly raised this contention below, he did not offer any proof of what her testimony would be. Thus, the record is insufficient to consider the contention, and we deem it forfeited.

21

He also contends that the trial court erred in excluding Hernandez's deposition testimony because it was not being offered for a hearsay purpose. We disagree. Appellant sought to introduce Hernandez's deposition testimony to demonstrate Magic Mountain's awareness that other guests had breached the perimeter fencing around the Ninja. Hernandez's deposition testimony that Grey stated that other guests had been ejected from Magic Mountain for entering the area was being offered to establish that Magic Mountain had previously ejected guests from the area and therefore was aware that the area was problematic. The testimony thus was offered for the truth of the matter asserted within the meaning of the hearsay rule. (Evid. Code, § 1200, subd. (a).)

Finally, appellant contends that Hernandez's deposition testimony was admissible because she was unavailable as a witness under Code of Civil Procedure section 2025.620.[13] However, in the trial court, he made no showing that he had "exercised reasonable diligence but has been unable to procure the deponent's attendance by the court's process." (Code Civ. Proc., § 2025.620, subd. (c)(2)(E).) Rather, appellant's counsel simply asserted that Hernandez was unavailable because she was in the military and that they had "tried to get her."

---

[13] Code of Civil Procedure section 2025.620 provides in relevant part: "At the trial or any other hearing in the action, any part or all of a deposition may be used against any party who was present or represented at the taking of the deposition . . . , so far as admissible under the rules of evidence applied as though the deponent were then present and testifying as a witness, in accordance with the following provisions: [¶] . . . [¶] (c) Any party may use for any purpose the deposition of any person or organization, including that of any party to the action, if the court finds any of the following: [¶] . . . [¶] (2) The deponent, without the procurement or wrongdoing of the proponent of the deposition for the purpose of preventing testimony in open court, is any of the following: [¶] . . . [¶] (E) Absent from the trial or other hearing and the proponent of the deposition has exercised reasonable diligence but has been unable to procure the deponent's attendance by the court's process."

22

Magic Mountain's counsel objected that there was no showing of appellant's effort to have Hernandez testify. We agree.

The assertion that counsel had "tried to get" Hernandez does not constitute an adequate showing of due diligence to obtain Hernandez's attendance by the court's process. (See *People v. Friend* (2009) 47 Cal.4th 1, 68 ["'The term "reasonable diligence" or "due diligence" under Evidence Code section 240, subdivision (a)(5) "'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character. [Citations.]'"' [Citation.]"].) The trial court accordingly did not abuse its discretion in excluding Hernandez's deposition testimony.

V.   *Evidence of Breaches at Other Magic Mountain Rides*

Appellant contends that the trial court abused its discretion in excluding evidence of breaches of perimeter fences at other rides at Magic Mountain. Appellant proffered the deposition testimony of Grey, who was a senior supervisor of rides, including the Ninja, at the time of appellant's accident, and was a mechanic for Magic Mountain at the time of trial.[14]

Grey was asked during his deposition, "Did you ever experience . . . anyone breaching the ride perimeter?" He replied that he had experienced it four times at a ride called the Tatsu. He knew that one of those incidents involved a breach of the ride perimeter to retrieve keys that had fallen out during the ride. He further stated

_____

[14]   Because Grey was an employee of Magic Mountain, appellant sought to use his deposition testimony under Code of Civil Procedure section 2025.620, subdivision (b), which allows an adverse party to use for any purpose "the deposition of a party or one who was an employee of a party at the time the deposition is taken to be used at trial against the other party, whether or not the deponent is available." (*Haluck v. Ricoh Electronics, Inc.* (2007) 151 Cal.App.4th 994, 1005; § 2025.620, subd. (b).)

that he knew of approximately 12 breaches by guests of perimeter fencing at Magic Mountain, including the four he experienced. However, none of the breaches occurred at the Ninja. He heard about the breaches on a radio used for communication by Magic Mountain employees.

Appellant argued that the evidence was relevant to show that Magic Mountain had notice of the dangerous conditions related to inadequate fencing, gaps in the fence, and/or signage. He further argued that it was relevant to show that Magic Mountain was negligent in determining a safe height for their perimeter fences and thus to establish the standard of care. The trial court excluded the evidence, reasoning that the breaches involved different rides and situations.

Appellant relies, as he did below, on the principle that "[w]hen evidence is offered to show only that defendant had notice of a dangerous condition, the requirement of similarity of circumstances is relaxed: '"all that is required . . . is that the previous injury should be such as to attract the defendant's attention to the dangerous situation . . . ."' [Citation.]" (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 404.) Nonetheless, in order to admit evidence of similar incidents, appellant is required to show substantial similarity. (*Colombo v. BRP US Inc.* (2014) 230 Cal.App.4th 1442, 1475.) The determination of substantial similarity ""'is primarily the function of the trial judge."' [Citation.]" (*Ibid.*) We will not disturb the trial court's determination unless the record shows an abuse of discretion. (*Stephen v. Ford Motor Co.* (2005) 134 Cal.App.4th 1363, 1371 (*Stephen*).)

Here, there was no showing of substantial similarity between the breaches of perimeter fencing at the Tatsu and appellant's accident. In fact, there was no showing of similarity at all. Appellant did not provide any details about the circumstances of the perimeter breaches, such as how or where the breaches

24

occurred. Grey's general statement that he knew of breaches at the Tatsu is not sufficiently detailed to show that the circumstances of the other breaches were substantially similar to the circumstances of appellant's accident. (See *Howard*, *supra*, 203 Cal.App.4th at p. 434 [similarity of other bathtub-slipping accidents not shown where there was no "detail about the conditions of or in the bathtubs, or the circumstances or medical conditions of the guests before they fell in the bathtubs"]; *Stephen*, *supra*, 134 Cal.App.4th at p. 1372 [substantial similarity of tire-failure accidents not shown where plaintiff did not provide police reports or other details about the age or condition of the tires or circumstances of the failures].) The trial court accordingly did not abuse its discretion in excluding the evidence of breaches at other rides at Magic Mountain.

VI.  *Evidence of Taller Perimeter Fences at Magic Mountain*

Appellant sought to introduce evidence regarding the height of perimeter fences around rides at Magic Mountain other than the Ninja. He argued that the fences surrounding newer rides, such as the Tatsu, were higher than the Ninja's because they were built later and Magic Mountain never upgraded the Ninja's fence by making it higher.

In support of his argument, appellant proffered the deposition testimony of Lorene Saylor, an auditing supervisor for Six Flags. Saylor, who was 5 feet 4 inches tall, testified that the fence surrounding the Tatsu's red lock area was taller than her in some places and over 6 feet high in others. Similarly, the perimeter fences surrounding the Riddler's Revenge, X2, Batman, Scream, Goliath, Viper, and Apocalypse were all taller than Saylor, making them almost a foot higher than the Ninja's perimeter fence, which was four-and-a-half feet high. The trial court excluded the evidence.

Magic Mountain argues, as it did in the trial court, that the height of other fences is irrelevant because the height depends on each ride's features and layout. We are not convinced.

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The disputed fact is whether the height of the Ninja's perimeter fence was sufficient to deter unauthorized entry.

Tailoring the height of the fence to each ride's layout makes sense for fences such as the wooden fence, whose purpose was described by Magic Mountain as cosmetic, to hide an unsightly area from guest view. In that situation, the height of the fence might vary depending, for example, on the slope or size of the unsightly area. However, the purpose of the perimeter fencing is to deter guests from entering an unauthorized area. The height considered sufficient by Magic Mountain to deter unauthorized entry at its other roller coasters is relevant to considering what height would be sufficient to deter entry into the Ninja's perimeter. Indeed, we note that Magic Mountain introduced extensive testimony (over appellant's continuing objections) from its expert Freeman about the heights of perimeter fencing at several roller coasters at Lagoon Park in Utah with no showing that these roller coasters share similarities with the Ninja. In short, the exclusion of evidence regarding the height of perimeter fencing at other roller coasters at Magic Mountain was an abuse of discretion.

VII.   *Evidence Regarding Signage*

Appellant contends that the trial court erred in excluding certain deposition testimony of Patrick Hoffman, Vice President for Safety, Security, and Risk Management for Six Flags Entertainment Corporation, concerning a management

decision to supplement signage on all roller coasters at all Six Flags parks in response to a fatal accident in Georgia in June 2008. We find no error.

Appellant's accident occurred on August 30, 2008. He testified that there were no signs warning him not to enter the area inside the chain link fence or of the danger if he did enter, and that he would not have entered had there been. He sought to introduce a portion of Hoffman's deposition testimony to show that at the time of appellant's accident, Magic Mountain had notice of the need for signage warning patrons not to enter the perimeter fencing of the Ninja.

In the relevant excerpt, Hoffman was asked whether he ordered the placement of warning signs in the area of the gap in the fencing around the Ninja. He replied that he "had asked that signs be put at all of our coasters late in 2008." He explained that in June 2008 someone was struck and killed by a roller coaster at a Magic Mountain park in Atlanta, Georgia after jumping over "two very high fences." The state of Georgia asked Six Flags to place "additional signage around the perimeter of that ride. . . . [T]he ride already had a number of signs on it that said, Danger zone, do not enter, authorized personnel only, those kinds of things." Hoffman testified that he and other members of "senior management" decided to install additional signage around all the rides at that park, and also "that it would be a good best practice . . . to install those on all of our coasters throughout our system."

The trial court excluded Hoffman's deposition testimony at the first trial as evidence of a subsequent remedial measure under Evidence Code section 1151,[15] and adopted the ruling without comment for the second trial. Appellant challenges

---

[15] Evidence Code section 1151 provides: "When, after the occurrence of an event, remedial or precautionary measures are taken, which, if taken previously, would have tended to make the event less likely to occur, evidence of such subsequent measures is inadmissible to prove negligence or culpable conduct in connection with the event."

this ruling, contending that the evidence was not inadmissible under Evidence Code section 1151 because it did not concern a remedial measure in response to *his* accident, but rather in response to a prior, unrelated accident.

We need not discuss the correctness of excluding the evidence under Evidence Code section 1151, because it was inadmissible for a more fundamental reason: it was irrelevant to the instant case. In substance, the proposed testimony would have established that sometime "late in 2008," following the June 2008 accident at the Georgia park and the request for additional signage by Georgia authorities, Hoffman and other senior managers decided to place additional warning signs around the roller coasters in all of the parks (presumably including the Ninja). Appellant contends that the decision to supplement the signage at all the parks was relevant to prove Magic Mountain was on notice of the need for additional signage at the Ninja when appellant's accident occurred. But the making of that decision sometime "late in 2008" does not show that the decision was made before appellant's accident in August 2008 (not generally considered a late month of the year). Hence, the decision does not reasonably tend to show that Magic Mountain was on notice of the purported need for additional signage at the Ninja before then. Moreover, that the Georgia accident occurred in June 2008 (before appellant's accident) and involved a patron who jumped over two high fences, does not, in itself, suggest that Magic Mountain was on notice that additional signage was required for safety at the Ninja. There was no evidence introduced concerning what, if any, similarity the fencing of the Georgia coaster bore to the fencing around the Ninja. Therefore, regardless of whether the decision to supplement the signage at the coasters at all Six Flags parks was a subsequent remedial measure inadmissible under Evidence Code section 1151, the evidence was properly excluded because it was irrelevant.

28

VIII. *Prejudice*

"A miscarriage of justice occurs if, based on the entire record, including the evidence, it is reasonably probable the jury would have reached a result more favorable to appellant[] absent the error. [Citation.] ''"[P]robability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." [Citation.]' [Citation.]" (*Nevarrez*, *supra*, 221 Cal.App.4th at p. 123.) "[E]rrors in civil trials require that we examine 'each individual case to determine whether prejudice actually occurred in light of the entire record.' [Citations.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801-802.)

Examining the entire record, we conclude that the evidentiary errors we have identified were not prejudicial. We have concluded that Eckman's testimony was inadmissible in its entirety, and that the testimony of Thomas Edgar and Tim Burkhart regarding the failure of DOSH to issue any citation in regard to the perimeter fencing for the Ninja was also inadmissible. But it is not reasonably probable that absent this evidence, a different result would have been reached. Under the other, properly admitted evidence, it was undisputed that the chain link perimeter fence around the Ninja met and exceeded the minimum height requirement of ATSM F1159-02. Appellant presented no evidence to dispute that fact. Moreover, Eckman did not purport to have conducted a full investigation and to have ruled out any negligence on Magic Mountain's part. Rather, the significance of Eckman's testimony and the inadmissible portion of Edgar and Burkhart's testimony was simply that the Ninja perimeter fence met the ATSM F1159-02 standard and Magic Mountain was not cited for violating that standard. But even without that evidence, there was no question that Magic Mountain was in

compliance with the standard. Thus, the inadmissible testimony added little to the jury's consideration of the case.

It is true that Magic Mountain's counsel relied on Eckman's testimony during closing argument, referring to it as the strongest evidence that Magic Mountain was not negligent. However, in addition to relying on Eckman's testimony, Magic Mountain's counsel also emphasized that Magic Mountain hired the Lundy group to conduct independent safety inspections and conducted its own internal safety inspections, all of which indicated that the Ninja's fence met and exceeded the minimum height requirement. In context, it is not reasonably probable that absent Eckman's testimony and the inadmissible portions of Edgar's and Burkhart's testimony, a different result would have been reached.

We also have concluded that the trial court erroneously excluded evidence concerning the height of fences at other Magic Mountain rides. However, it is not reasonably probable that the introduction of that evidence would have resulted in a different verdict. The chain link fence around the Ninja was four-and-a-half feet high. The evidence of other fencing that appellant sought to introduce merely showed that the fences at some other attractions were about five-and-a-half to six-feet tall. Nothing at trial suggested that such additional height would have deterred or prevented appellant from entering the area where he was injured. Indeed, appellant was told by at least one ride attendant not to try to retrieve the hat because it was too dangerous. Appellant's own expert, Dr. Mark Sanders, opined that appellant was so "obsessed" with retrieving his hat that a warning sign would not have stopped him. He stood on an approximately 3-foot tall box at the base of the perimeter fence to climb over. Standing on that box, for even a six-foot-high fence he would have had to have traverse only an additional three feet of fence. In short, the evidence of the height of other fences at Magic Mountain was of very

30

limited probative value, in that it did not reasonably suggest that the modestly lower fencing height at the Ninja was negligent in itself or that it substantially contributed to appellant's ability to traverse the fence. (See *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477 [to prevail on negligence claim, plaintiff must show that defendant owed a duty of care, it breached that duty, and the breach was a legal cause of the plaintiff's injuries].) "To establish causation, a plaintiff must prove that the defendant's conduct was a 'substantial factor' in bringing about his or her harm. [Citations.] Stated differently, evidence of causation 'must rise to the level of *a reasonable probability based upon competent testimony*. [Citations.] "A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action." [Citation.] . . . .' [Citation.]" (*Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 312.) "Where there is evidence that the harm could have occurred even in the absence of the defendant's [alleged] negligence, 'proof of causation cannot be based on mere speculation, conjecture and inferences drawn from other inferences to reach a conclusion unsupported by any real evidence . . . .' [Citation.]" (*Padilla v. Rodas* (2008) 160 Cal.App.4th 742, 752.)

On this record, we cannot conclude that absent the errors we have identified (the erroneous admission of Eckman's testimony and the other testimony regarding DOSH's non-issuance of citations to Magic Mountain, and the exclusion of evidence regarding the height of perimeter fencing at other Magic Mountain roller coasters), it is reasonably probable that a different result would have been reached.

//

//

31

## DISPOSITION

The judgment is affirmed.  The parties are to bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.

COLLINS, J.